[No. 6495.]

## SELFRIDGE v. THE PEOPLE.

1.  Criminal Law — Incompetent Evidence — Harmless Error —The improper admission of statements attributed to the accused is harmless if the testimony could not have swayed the jury. —(279)

2.  Instructions—Harmless Error — An instruction substantially given in other words may properly be refused.—(280)

So of an instruction which asserts only what all men are conclusively presumed to know.—(282)

So of an instruction that each part of the charge is to be taken in connection with the residue.—(281)

*Error to Mineral District Court* — Hon. C. C. HOLBROOK, Judge.

Mr. HENRY M. FURMAN, for plaintiff in error.

Hon. W. H. DICKSON, attorney general, and Mr. GEORGE D. TALBOT, assistant attorney general, for defendant in error.

The plaintiff in error and one Charles B. Tharp were tried in the district court of Mineral county for the murder of Howard V. McKinney. Tharp was acquitted. Selfridge, hereinafter called the defendant, was convicted of murder in the first degree, and the jury fixed his punishment at imprisonment for life. To reverse the judgment of the lower court, the defendant prosecutes this proceeding in error. McKinney was shot and killed by the defendant on the 31st day of July, 1907, in Mineral county. The testimony on behalf of the people tends to show the following facts: About 11 o'clock of the evening of July 30, 1907, the defendant came from Creede to his home, at or near Wagon Wheel Gap. After his return, the defendant and his brother-in-law, Tharp, had a conversation, overheard by a man in an adjoin-

ing room, wherein it was mentioned that McKinney owed Tharp some money, and that McKinney could be found at the station the next day. Tharp expressed the idea that McKinney would not pay the money, whereupon the defendant asked Tharp to give him, the defendant, an order for the money, and the defendant would take a gun with him and if McKinney did not pay the money, the defendant would "jab or shoot McKinney's head off." It was further arranged that Tharp should feign illness the next morning, so that the defendant could lay off from his work. About 11:30 of the same evening, Tharp and the defendant went to the home of one Triplett, and borrowed from the latter a Winchester rifle, for the alleged purpose of hunting for bear the next day. The next morning, Tharp gave the defendant an order on McKinney for the money, and the defendant said, in the presence of a witness, that he would get the money or "kick and cuff McKinney around," and looked significantly toward the gun, which stood in a corner of the room. The defendant, on that morning, told his employer that his wife was sick and for that reason he would get one Black to work in his stead that day. On that same morning, McKinney was loading a car at the station with what the witnesses called props. The car was an ordinary box-car with an open door on either side. Two men were helping him load the car. The men were apparently strangers, employed that morning for the day. These two men were on one side of the car, handing the props to McKinney, who was in the car. Some time during the forenoon Tharp came to the car, got in, and talked with McKinney. The conversation appeared harmless and friendly enough. After awhile, and while Tharp was in the car, the defendant, carrying the gun he had borrowed the night before, appeared at the car

door on the side opposite from where the two men were at work. These two men narrate what took place. The defendant held a paper toward McKinney, and said it was an order. McKinney asked, "What order?" whereupon the defendant, holding the gun in a menacing manner, violently and profanely ordered McKinney to come out of the car. McKinney at once obeyed the command, and just as he came to the ground, the defendant ordered him to stop, and immediately fired the shot that instantly killed McKinney. The bullet entered his body near the heart. Neither of the two men observed any knife in McKinney's hand. About the time the shot was fired, they started around the car to go to the depot. There was a very short interval when no one saw either Tharp or the defendant, or the body lying on the ground. At the end of the car, the men were met by the defendant, who asked them if they had seen McKinney run at the defendant with a knife, and they told him they had not.

There was a small pocket knife in the left hand of the dead man, held between the thumb and forefinger. McKinney was right-handed. This knife was identified by a witness as having been in the possession of Tharp. This witness testified that, at the time of the coroner's inquest on the body of McKinney, Tharp told the witness that, if asked about the knife, the witness should say he knew nothing about it. McKinney was known to have only one knife, which was taken from his right-hand pocket by the coroner. The theory of the prosecution was, that Tharp or the defendant placed the knife in the dead man's hand, as a basis for the theory of self-defense.

The testimony of the defense, consisting mainly of the testimony of Tharp and the defendant, and

defendant's wife, denies that there was any conversation on the evening of the 30th about McKinney, denies making any threats against McKinney; admits that the gun was borrowed from Triplett about 11:30 of the night before the homicide, for the purpose of hunting for bear the next day, if defendant's wife, who was then sick, should be better in the morning, and also that while Tharp and the defendant were out that night for the purpose of borrowing the gun, the defendant made arrangements with Black to work in his place the next day.

The testimony for the defense further tends to show that the next morning Tharp gave the defendant an order on McKinney for money which was due him. About nine o'clock, Tharp went to the car where McKinney and the two men were at work, got into the car and talked with McKinney, telling him that he had given the order to defendant. While Tharp was in the car, the defendant came to the door, exhibited the order, and said to McKinney that he had an order for the money. McKinney asked, "What order?" The defendant told him, and at once McKinney put his hand in his left pocket and started toward defendant. The defendant told him to stop and not get out of the car. McKinney jumped out of the car, and with the knife in his hand, started toward the defendant, who backed away, raised his gun and commanded McKinney to stop or the defendant would shoot him. McKinney still continued to advance upon the defendant, who at length fired the shot that killed McKinney. Tharp and the defendant denied that either of them placed the knife in McKinney's hand, and there was evidence that Tharp had another knife that resembled the one in the dead man's hand.

After stating the facts as above,

Mr. Justice Musser delivered the opinion of the court:

The defendant has assigned eight errors. The first and second relate to the refusal of the court to strike out the testimony of two witnesses to the effect that they had heard the defendant say that McKinney owed him some money, and that if he, the defendant, could not collect it one way, he would another. Defendant says that such language does not constitute a threat. It is impossible to understand how this testimony, even if inadmissible, could have swayed the jury in the least against the defendant, especially in view of the fact that two other witnesses testified, without objection, to two instances of positive threats made by the defendant against McKinney the evening before and the morning of the homicide.

The other assignments of error relate to the refusal of the court to give certain requested instructions.

In the third assignment, complaint is made that the court, in its instruction relative to self-defense, did not tell the jury that the matter must be "viewed from defendant's standpoint." It seems the defendant claims that the precise words, "viewed from defendant's standpoint" should be used. The court told the jury that if the defendant believed at the time that he was in danger of losing his life or limb, or receiving great bodily harm, that fact would constitute a defense for the defendant so situate, and so believing honestly and in good faith, even though the danger be not real, but only apparent. Under such an instruction, the jury could not view the matter from any other standpoint than that of the de-

fendant. The instruction as given was extremely
liberal to defendant, and we do not wish to be under-
stood that it can or can not be approved from the
standpoint of the people.

The defendant, in his fifth assignment of error,
complains because the court refused to give an in-
struction, as requested, relative to the presumption
of innocence. The court gave the usual instruction
on this point, which fully and correctly stated the
law, as it likewise did on the matter of instructions
requested, the refusal of which constitute the sixth
and seventh assignments of error. Of these two as-
signments last mentioned, it is sufficient to say that
the court so fully covered the matters in the seventh
assignment that no attempt is made to uphold that
assignment in the brief, and, for the same reason,
the sixth deserved the same fate. When the matter
contained in a requested instruction is substantially
embodied in those given, it is not error to refuse to
give the instructions asked. This has been decided
by this court too often to need further notice.

The fourth assignment is predicated upon the
refusal of the court to give requested instruction
number 3½. By this instruction it was sought to tell
the jury that they had no right to take the state-
ment of an attorney as to what the law in the case
was, unless the court gave an instruction to that
effect; that it was their duty to try the case on the
evidence introduced and the instructions given by
the court, and that all the law was not embodied in
any one instruction, and in construing any instruc-
tion they must consider it in connection with all of
the others given, and harmonize all. The cases
cited in the brief do not sustain the contention that
it was error to refuse to give such an instruction.
The instruction asked embraces three distinct prop-

ositions. It is first sought thereby to tell the jury that they must not take the statement of an attorney as to what the law is in a case. This is certainly not applicable in this state, where instructions are given before the arguments to the jury, nor does the record in the case reveal that any attorney attempted to state the law to the jury before the instructions were given, nor thereafter, except as given by the court. It is next sought by requested instruction number $3\frac{1}{2}$ to have the jury told that they must try the case on the evidence introduced and the law given by the court. The court, over and over again, in the instructions given, reiterated that the jury must find the facts from all the evidence in the case, and the jury had no law given them, except what was given by the court in its instructions. We might dismiss this assignment with the remark that the instruction, as framed, contained, first, a statement that was wholly inapplicable, and, second, a statement which was merely a repetition of what the court did say, and for that reason the latter part of it, which might be a correct proposition of law, must fall with that which preceded it. No case is cited wherein it is held error to refuse to tell the jury that they must construe one instruction in connection with all the others. One or two cases are cited wherein it was held that it was not error to give such instruction when it was assailed. This court has time and again upheld instructions by stating that all the instructions should be construed together and harmonized, assuming that the common knowledge of the jurors would lead them to do this without being specifically told to do so.

The court was requested to tell the jury that, if the defendant armed himself with a gun for the purpose of sport, he had a legal right to do so, and if

this was his purpose, then no presumption of guilt could be entertained against him, because he so armed himself. The court refused to give this, and this refusal constitutes the eighth assignment of error. There are some things that are so manifestly true that all sane and intelligent men know and act upon them of their own motion. This is one of those manifest truths. We must assume that the men composing this jury were sane and intelligent, and that they knew, without being told, that one has a right to arm himself for the purpose of hunting, and if .he did arm himself for that purpose it is not to be presumed therefrom that he intended to kill someone.

No objection was made to any of the instructions given. They were in plain language, concrete terms and direct form. They covered every phase of the case from the viewpoint of the defendant, and nothing beneficial to him could have been added.

The defendant has had a fair trial before a lawful jury. That jury has said, upon the oath of its members, that he is guilty of taking human life, under circumstances constituting murder. The verdict is a just one, and the punishment is the least that should be imposed. His attorney, as was his duty, has made the best possible presentation of his case to this court. Life is not a cheap thing, and he who unjustifiably takes it should pay the price the law exacts. The defendant alone is responsible for the predicament in which he finds himself, and it is right that he should bear the consequences of his infraction of the law.

The judgment will be affirmed.

*Affirmed.*

CHIEF JUSTICE STEELE and Mr. JUSTICE CAMPBELL concur.