MILLS *v.* STATE.

Opinion delivered May 25, 1925.

1. CRIMINAL LAW—CHANGE OF VENUE.—Where persons who signed affidavits supporting a motion for change of venue testified that there was a general belief in the county that, because deceased was a brother of the sheriff, who was the most influential man in the county and actively interested in the prosecution, accused would not have a fair trial, it was error to refuse a change of

venue, in the absence of a showing that affiants lacked information on which they based their opinion, so as to warrant a finding that the affiants were not credible persons.

2. CRIMINAL LAW—PETITION FOR CHANGE OF VENUE—EXAMINATION OF AFFIANTS.—Persons making affidavits in support of a petition for change of venue may be examined orally before the court, not for the purpose of trying an issue as to the truth of the allegations, but solely for the purpose of determining the credibility of the affiants.

3. HOMICIDE—INSTRUCTION AS TO SELF-DEFENSE.—An instruction that, even if accused fired the first shot in self-defense, still if he fired the second shot when it was not necessary to defend himself, then he would be guilty of murder in the second degree or manslaughter if the second shot contributed to deceased's death, *held* erroneous as making the necessity to depend upon the viewpoint of the jury, instead of that of the accused.

4. CRIMINAL LAW—STATEMENT BY ACCUSED.—Where accused, in testifying in his own behalf, denied having made a statement sworn to by a State's witness, it was error to refuse to permit him to state what he did say to the witness.

Appeal from Miller Circuit Court; *J. H. McCollum,* Judge; reversed.

*J. M. Carter, W. H. Arnold* and *B. E. Carter,* for appellant.

*H. W. Applegate,* Attorney General, and *Darden Moose,* Assistant, for appellee.

SMITH, J. Appellant was indicted for the crime of murder in the second degree, alleged to have been committed by shooting one Will Barber. He was found guilty of manslaughter and given a sentence of three years in the penitentiary, and has appealed.

The deceased Barber and the appellant Mills lived near the Red River levee, and an act had been passed by the General Assembly of the State authorizing the levee directors to shoot hogs found running at large upon the levee. Dr. Barber's hogs ran on the levee, and several of them were killed, and he suspected defendant of having killed them. Deceased became embittered against Mills, and on one occasion, about a month before the killing, announced his intention of whipping Mills, and, after inviting several bystanders to witness the whip-

ping, he assaulted Mills and struck him over the head with a club, and inflicted a serious wound. Mills, who was a deputy sheriff, was armed with a pistol at the time, but made no attempt to shoot Barber. Subsequent to this incident more of Dr. Barber's hogs were killed, and he was shown to have made violent threats against Mills.

On the morning of the killing Mills went to a sawmill on the levee to see about some lumber. He carried his rifle with him, but explained that he was doing so for a lawful and peaceable purpose. After finishing his business he started home, and was walking in the road which ran along the banquette of the levee. As he was proceeding homeward he met Barber, who was walking on the top of the levee. Barber had recently broken his arm and had it in a sling, but, as he saw Mills, he started walking towards him down the levee, and as he walked up to Mills he was seen to be talking to him angrily.

These facts are established by the witnesses for the State, all of whom appeared to realize that a difficulty was about to occur, as they knew the feeling between the parties, and one of the State's witnesses remarked that "Dr. Barber was looking for Jesus."

There is a conflict in the testimony as to just what occurred thereafter. No witness was close enough to hear just what occurred between the parties, but the undisputed testimony shows that Dr. Barber was seen gesticulating with his sound arm.

Mills testified that, when Dr. Barber approached, it was apparent that Dr. Barber was very angry, and he accused Mills of having shot more of his hogs. Mills testified that he denied having done so, when Dr. Barber told him he was a liar, and that he was going to kill him, and that Barber put his hand in his pocket, and he, believing Barber was about to execute his threat, raised his rifle, and, without putting it to his shoulder, commenced firing, and fired two shots in rapid succession. He further testified that Barber was armed, and that he saw his pistol and believed Barber was about to shoot him.

It was shown that Dr. Barber smoked a pipe incessantly, and the testimony on the part of the State was to the effect that Barber was unarmed at the time he was killed, that he was smoking his pipe at the time he met Mills, and that, while talking to Mills, Barber put his pipe in his pocket, and that, as he was doing so, Mills commenced to shoot.

There was testimony on behalf of Mills that Barber was not smoking at the time the shots were fired, and that he did not have his pipe in his hand when he reached for his pocket.

Barber was a brother of the sheriff of the county where the killing occurred, and the sheriff was shown to be a man of predominant influence in the county; he employed special counsel to assist in the prosecution, and the killing appears to have been much discussed throughout the county.

Before the trial, Mills filed a petition for a change of venue, which was in proper form. This petition was supported by the affidavits of ten persons, one of whom proved not to be a qualified elector. The remaining affiants were summoned to appear before the court for examination as to the basis of their opinion that Mills could not obtain a fair and impartial trial. One of these affiants was ill and could not attend court, but the remaining eight appeared and were examined. The first of these affiants testified that he had heard probably a hundred men who lived throughout the county discuss the case, and he had concluded, from what he had heard these men say, that Mills could not obtain a fair trial in the county. He testified that there were two factions in the county, one of which favored the sheriff, and the other opposed him, but the sheriff's faction was overwhelmingly in the majority, and that, if one of the sheriff's friends got on the jury, Mills would not get a fair trial, and, if one of the sheriff's enemies got on the jury, he would not give the State a fair trial.

Other affiants who were examined do not appear to have heard so much about the killing, but they all

testified that the killing had been widely discussed, and the effect of the sheriff's participation was frequently conjectured, and the opinion was common that the sheriff's influence and prestige would militate against Mills securing a fair and impartial trial.

These witnesses testified that they had heard the killing discussed in various townships of the county, which were named, and from which an experienced attorney, who was not shown to be connected with the trial, testified that ninety-five per cent. of the jurors were selected for the various terms of court.

The court denied the petition for a change of venue, and this action is assigned as error.

We think a showing was made upon which the venue of the case should have been changed. The witnesses were shown to have heard discussion of the case by electors residing in various parts of the county, and it was generally known that deceased was a brother of the sheriff, who was the most influential man in the county, and actively interested in the prosecution. Under this testimony a change of venue should have been granted. The affiants were not shown to have sworn with that lack of information upon which to base the opinion they expressed which would warrant the court in finding that the affiants were not credible persons.

The rule by which the trial court should be governed in passing upon an application for a change of venue in a criminal case was restated by this court in the recent case of *Spurgeon* v. *State,* 160 Ark. 112, where we quoted from the case of *Whitehead* v. *State,* 121 Ark. 390, as follows: " 'The trial court exercises a judicial discretion in passing upon the credibility of the affiants, but its discretion is limited to that question. When the petition for change of venue is properly made and supported, the court has no discretion about granting the prayer thereof, whatever the opinion of the court may be as to its truthfulness. The statute provides no method by which the court may determine the credibility of the affiants, but leaves the question to the court. A number

of cases, however, have approved the practice of calling the affiants and examining them as to the source and extent of their information, for the purpose of ascertaining whether or not they have sworn falsely or recklessly without sufficient information as to the state of mind of the inhabitants of the county as to the accused. But the cases also hold that the statute on this subject does not contemplate that the truth or falsity of the affidavits shall be inquired into, and that the only question for the determination of the court is whether or not the affiants are credible persons, and that all inquiry must be confined to. that question.' "

The testimony shows that the first shot fired inflicted only a slight flesh wound, while the second shot was almost immediately fatal, and, upon this phase of the case, the court gave, over objection of Mills, an instruction numbered 15, which reads as follows: "Although you may believe that the defendant fired the first shot in necessary self-defense, still, if you believe the second shot was fired at a time when it was not necessary to further defend himself, then the defendant would be guilty of murder in the second degree, or manslaughter, provided you believe the second shot contributed in any manner to the death of the deceased."

This instruction was objected to generally at the time it was given, and the specific objection was made that it permitted the jury, rather than the defendant, acting without fault or carelessness, to determine whether it was necessary for the defendant to fire the second shot. The instruction was erroneous in the particular indicated, and should have been modified as requested.

After Mills had killed Dr. Barber, he went to Walter Oden, who was also a deputy sheriff, and surrendered, and Oden was asked to state what Mills said when he surrendered, and the witness answered: "A. Well, to the best of my recollection, he said he wanted to kill him, he didn't want to cripple him." On his cross-examination the witness admitted that his hearing was

defective, and that he might be mistaken as to what Mills had said. Oden was then asked this question: "Q. Didn't he tell you he was crippled and he didn't want to have any trouble with him, and he had to kill him, and isn't that what he told you?", The witness answered: "A. Well, something to that amount, that is, it was all in line there; he said something else, I disremember what it was, but I think that's the contention—he had to shoot him because he was afraid of him. I asked him the particulars of it. He said he had to kill him to keep from getting killed."

When called as a witness on his own behalf, Mills denied making the statement which the witness Oden had first attributed to him. He was then asked what he did say to Oden, and the court sustained an objection to the question, and refused Mills permission to answer. Had witness been permitted to answer the question he would have testified that what he did say to Oden at the time he surrendered was that he didn't want to kill Barber, as he was crippled already, but he had to do so to save his own life.

We think the exclusion of this testimony was error. It is true the witness· Oden did qualify his first statement, but he did not withdraw it, and his apparent candor in admitting that he might be mistaken may have given added weight to his testimony by making it appear that he had no prejudice against Mills and no desire to do his case an injustice. The court should have permitted Mills to relate what he did say, and thus afford the jury the opportunity to consider Mills' version of the conversation.

The rule governing such cases was stated in the case of *King* v. *State*, 117 Ark. 82, where we said: "In the case before us, the record shows that, on the former trial of the case, the defendant had testified as a witness, and admitted the killing, but the admission was accompanied by an explanation of the circumstances attending the killing, and it is an elementary rule of law that, when admissions of a defendant in the nature of a

confession are allowed in evidence against him, all that he said in that connection must also be permitted to go before the jury. That is to say, whatever explanation he may make in regard to the killing or in regard to the circumstances attending it, are to be admitted in evidence just as much as the admission of the killing itself. The jury are the sole judges of the weight of the testimony and the credibility of the witnesses, and it was the duty of the jury to consider not only the testimony of the State to the effect that the defendant, on the former trial, had admitted the killing, but also the explanation he made at the time as to the circumstances attending it. The jury were not required to accept or reject such testimony in its entirety, but it was their duty to accept such portions of the testimony in the whole case as it believed to be true, and to reject that which they believed to be false. *Pickett* v. *State*, 91 Ark. 570; *Allison* v. *State*, 74 Ark. 444.'".

Other assignments of error are discussed, but they relate either to matters which are not likely to recur upon the retrial of the cause, or are not deemed of sufficient importance to require discussion.

But, for the errors indicated, the judgment must be reversed, and it is so ordered, and the cause will be remanded for a new trial.