No. 15,663.

WINBERN *v.* THE PEOPLE.
(180 P. [2d] 516)

Decided March 31, 1947.

Mr. RALPH L. CARR, Mr. WILBUR E. ROCCHIO, for plaintiff in error.

Mr. H. LAWRENCE HINKLEY, Attorney General, Mr. DUKE W. DUNBAR, Deputy, Mr. JAMES S. HENDERSON, Assistant, for the people.

*En Banc.*

MR. JUSTICE LUXFORD delivered the opinion of the court.

THIS is a criminal case in which defendant was convicted of murder of the second degree and sentenced to a term in the penitentiary. He brings the case here for a review of that judgment, and alleges: (1) That the

court erred in giving certain instructions, to the giving of which, however, he interposed no objection; and (2), he asserts that the court committed error in failing to instruct the jury on another point, although he tendered no instruction covering the subject.

As to the first point, "This court has repeatedly held that it will not consider objections to an alleged erroneous instruction unless an objection is made to the specific instruction at the time, to the end that the trial court may have opportunity to pass upon the particular objection urged." *Dillulo v. People,* 56 Colo. 339, 341, 138 Pac. 33; *Sarno v. People,* 74 Colo. 528, 223 Pac. 41; *Blanchard v. People,* 74 Colo. 431, 222 Pac. 649; *Koontz v. People,* 82 Colo. 589, 263 Pac. 19; *Grandbouche v. People,* 104 Colo. 175, 189, 89 P. (2d) 577.

As to the second point, no instruction was offered and we have held that, "Mere nondirection in such circumstances is not error." *Reagan v. People,* 49 Colo. 316, 326, 112 Pac. 785; *Mow v. People,* 31 Colo. 351, 361, 72 Pac. 1069; *Brown v. People,* 20 Colo. 161, 36 Pac. 1040.

The foregoing disposes of this review unless considerations of justice require a waiver of the application of the above rules.

The evidence discloses that on the night of November 1, 1930, a box supper and dance were held at Dry Creek school house in Las Animas county, for the purpose of raising money by selling cakes and pies, perhaps other things—auctioning them off—to raise money for the purchase of presents, and providing a Christmas tree for the children at that Christmas time. Fifty or more of the men, women, and children of the district were present. T. B. Winbern, plaintiff in error, to whom we hereinafter refer as defendant, and his two brothers, although not residents of the district, came as uninvited guests with considerable whiskey in their automobile. Before they commenced to dance, defendant, according to the people's evidence, exhibited a knife and expressed

an intention of breaking up the dance and causing trouble. One of the brothers became noisy and boisterous and was finally ejected from the building by the secretary of the school board. In an ensuing scuffle outside, defendant drew his knife and stabbed the secretary in the leg, and, when the latter returned to the school room limping and bleeding, three other men, including Millard Martin, deceased, went outside. Martin was a mere bystander until defendant "walked up and started talking to him." Immediately a fight started between the two, and all three of the Winbern brothers joined in the attack on Martin. One witness testified, "I seen T. B. [defendant] take what I would call, a hop, step and a jump, and he struck Millard Martin here. I heard the lick, and saw the lick. I still thought they were fighting with fists, and Millard [deceased], hollered he was stabbed." Deceased fell with two stab wounds in the back, either one of which would have been fatal. He was carried into the schoolroom, laid on the floor, then later taken to the hospital where he died the next day. After the melee in which Martin was fatally injured, in a fight that followed, others were stabbed and cut by the Winberns, but finally defendant and his brother Vernon went home. A criminal information was filed, charging them with murder of deceased, but before they could be taken into custody they fled to Utah, Idaho, and Oregon, where they lived under assumed names. Finally, after more than thirteen years, they were apprehended, brought back and tried for murder under the information filed against them in 1930. At the trial, questions were propounded to, and answered by, defendant, as follows: "Q. Did you use a knife that night? A. No, sir; I didn't. Q. Carry any gun or a knife? A. No, sir. Q. Did you strike anybody with a knife? A. No; I didn't. Q. Did you have a knife in your hand at any time? A. No, I didn't."

 After all the evidence had been presented, and both sides had rested, objections were made to the

court in chambers by both of the able attorneys for defendants, to instruction No. 7, proposed by the court on first degree murder, which said objections were overruled and exceptions allowed. The jury found defendant guilty of murder in the second degree, and a motion for a new trial was filed and overruled. Other counsel bring the case here on error, and complaint is made for the first time concerning instructions given on self-defense. Defendant testified definitely and positively that he had no knife, and that he did not stab deceased. That being true, he has no grounds for complaint as to instructions given on self-defense. *Kelly v. People,* 17 Colo. 130, 29 Pac. 805. While we do not commend the wording of the instructions given on that subject, yet we are satisfied that when all of the given instructions were read and considered together as a whole, the jury was sufficiently advised as to the law of the case and that the court committed no error in giving them. Defendant did not contend that he stabbed deceased in defending himself against joint attack. He, therefore, had no theory of the case which would justify the giving of an instruction on that subject. "It is not error to refuse instructions which are not applicable to any facts or testimony in the case." *Jones v. People,* 93 Colo. 282, 285, 26 P. (2d) 103.

Plaintiff in error cites *McRae v. People,* 101 Colo. 155, 71 P. (2d) 1042, as supporting his contention; but there defendant claimed that deceased met her death by the accidental discharge of a gun; that was his theory of the case and, "it justified an instruction on that theory." Clearly the authority is not in point here. From the testimony introduced upon the trial, the principal question to be determined was: How, and by whom were the fatal wounds inflicted? The court's instructions thoroughly covered that phase of the case. As the court said in *Kelly v. People, supra:* "There was no substantial error in the charge of the court as given; and no further instructions were prayed in behalf of defendant. It must, therefore, be supposed that the able and vigilant

counsel of defendant considered, that the instructions given were as full and complete in every substantial respect as the evidence would justify."

The defendant appears to have had a fair and impartial trial.

The judgment is affirmed.

MR. JUSTICE ALTER concurs specially.

MR. JUSTICE HILLIARD dissents.

MR. JUSTICE ALTER specially concurring.

I concur in the court's opinion solely on the ground that the points urged for reversal by counsel here were not raised by counsel below, and I do not feel warranted in examining notwithstanding such failure. I am convinced that the instructions challenged on review here are erroneous, and had there been proper objections below, I should not hesitate to vote for a reversal of the judgment.

MR. JUSTICE HILLIARD dissenting.

Plaintiff in error, defendant below, and his brother Vernon were charged with murder. Defendant was found guilty in the second degree, and his brother of voluntary manslaughter. Defendant was sentenced to a minimum of thirty-five years in the penitentiary, and only he seeks review. Instructions numbered eighteen and nineteen are challenged in particulars I shall state as I proceed. The court has declined to examine, for that, as premised, counsel below interposed no objections to the matters and things of which present counsel complain on error. I am not in accord with that holding. On the contrary, considering the gravity of the charge, the severity of the sentence, and the prejudicial error appearing, demonstratively clear, as I am convinced, Anglo-Saxon conception of procedural justice should move reviewing judges to give pause. Besides, to do so

would conform to our previous holdings. *McRae v. People,* 101 Colo. 155, 71 P. (2d) 1042; *Reppin v. People,* 95 Colo. 192, 34 P. (2d) 71. See, also, *Bogileno v. United States* (10 C.C.A., Colorado case), 38 F. (2d) 584; *State v. Waid,* 92 Utah 297, 67 P. (2d) 647. The authorities are illuminating.

With all respect, I venture to suggest that the court in its opinion does not adequately state the facts as they appear from the record, and, in some instances states them incorrectly, as my study convinces. It is stated in the opinion that defendant and his brother were uninvited guests at a "box supper and dance" at a school house given "for the purpose of raising money" for a Christmas tree, etc. But the Attorney General says there "is no suggestion that attendance at this social event was in anywise restricted." There is nothing to indicate that the attendance of the three Winbern brothers, in itself, was objectionable or undesirable. As recited in the court's opinion, it was a "money raising" social gathering. Not in the inception, therefore, but in the eventualities, is there basis of complaint. The Attorney General says the brothers were in possession of "moonshine liquor [this was in Volstead days]," but only "Fred Winbern * * *," as the Attorney General adds, "seemed to have consumed an excessive quantity of the intoxicant, and the other two were at least able to restrain themselves during the festivities of the evening until the climax which resulted in the death of M. L. Martin." Following a box supper the dance started, "and it is generally conceded," the Attorney General continues, "that T. B. [plaintiff in error here] and Vernon [the brother joined in this prosecution below], participated in the dancing, while Fred contented himself with being quite noisy, clapping his hands, stomping his feet, and generally making himself offensive to others." The trouble that eventuated in the tragedy had its inception when "Fred [not dancing] slapped a woman on the back and spoke slurringly to her," says the Attorney General. The

president of the school board remonstrated with him and asked that he cease his antics. Fred agreed to quiet down; but his promise was not kept for long. Then the secretary of the board, one McAtee, undertook to quiet him. Fred was disposed to argue with him, and challenged his ability to put him out. McAtee grappled with the drunken man, who himself did some grappling. They got outside the door and fell to the ground. "McAtee jumped to his feet and said, 'Why don't you go home?' Fred said, 'All right.'" Sometime during the struggle, however, McAtee was stabbed in the leg and he said Fred had done it. It is clear that up to that time, only Fred was boisterous and had to be "thrown out." Until then the other brothers, the defendant here and Vernon, had been conducting themselves in an orderly fashion. Indeed, they themselves endeavored to cause their older, and evidently intoxicated, brother to observe better deportment. Neither plaintiff in error nor Vernon had part in the trouble between Fred and McAtee. In connection with that incident, and before I shall give attention to the next one, I pause to call attention to the fact that the Court in its opinion states that "defendant drew his knife and stabbed the secretary [McAtee] in the leg." That statement is most unfair, for it was Fred, not "defendant," as all concede, and the district attorney emphasized below, who had trouble with McAtee, and an interesting sidelight is that Fred, tried for that offense, was acquitted.

"When McAtee came back into the room, bleeding," continues the Attorney General, "three other men, Willard Martin, Melvin Allen and Clyde Kygar, immediately went outside to discover the reason for his injury." Counsel for defendant say "Willard Martin, Red Kygar, Melvin Allen, and several other men, decided to take the law into their hands and dashed outside to attack" the Winberns. It is clear from the record that the men named, and many others, excited and angry and feeling a sense of outrage, not at all surprising, rushed

out to the scene of the encounter. In the interest of calm consideration, however, as I conceive, it is important to keep in mind that Fred Winbern was the person McAtee put out, and who engaged him in combat outside. Out of that "show of strength," not shirked by either of the combatants, as the record makes plain, and in which there were not other participants, McAtee claimed to have been stabbed in the leg by Fred. That he had been stabbed and was bleeding when he returned to the building seems certain, for that, also seemingly certain, was what caused the other men to rush out of the school-house. As already stated, Fred was promptly tried for his part in the McAtee difficulty, and acquitted. A sobering thought is that that encounter, necessarily sparingly revealed here, must not have been altogether one-sided.

It is clear that there was a crowd of men (one of the prosecuting witnesses said there were about forty) outside immediately following the McAtee incident. Unquestionably, and, I should say, naturally, the crowd was antagonistic to the Winberns, and none knew it better than the several Winbern brothers. Without regard to what should have been the resolution factually on the principal issue, not within our purview in any event, all must agree that the Wilberns, outnumbered by at least ten to one, were faced by an angry crowd, for the moment not particularly observant of the rule that only to the law should they have resort. It is not likely that at that stage of the difficulty, any of the Wilberns was initiating an attack. Indeed, one witness for the prosecution said of defendant here, and this review concerns only him, did "not hit anybody before he was hit. He hadn't caused any trouble before he was hit. He didn't attack Melvin [deceased] before he was hit." Not only so, but witnesses for the prosecution generally told varied stories concerning the difficulty which followed the McAtee stabbing, in which, as all agree, only he and Fred Winbern had part. I do not question that the case

made by the prosecution warranted its submission to the jury, nor in the absence of prejudicial error otherwise, that the solution reached by the jury would be controlling. Even after defendant here had testified, from whose testimony I shall presently quote, and which contradicts the showing by the prosecution, still, I should say', resolution by the jury was in order. It is even more clear that the complexities attending the factual situation should have prompted the exercise of unusual care in the preparation of instructions submitted by the court. My conviction is that there was such departure from correct rules in that regard, that defendant did not have a fair trial, a question, the determination of which is the chief concern of reviewing tribunals. It is pertinent to observe that counsel for defense here do not contend that the controlling facts were determinable other than by the jury; but they do claim that certain instructions were prejudicially erroneous. In that situation, as I think, we have not justified our constitutional duty to examine the instructions, by stating—quoting in part, a few detached damaging statements from witnesses for the prosecution, as was essayed by the court in its opinion. I shall now quote from the testimony of defendant and his brother Vernon, jointly charged and tried below, and after brief comment on the issues which result therefrom, and reviewing *Kelly v. People, infra,* cited in the court's opinion, I will state and examine the two challenged instructions.

After stating that McAtee, looking "angry," grabbed Fred's head, etc., defendant testified as follows: "Q. What happened at the door? A. Well, I ran to grab Mac, to stop it, and they went out the door, I don't know which side or where, but out there three or four feet from the door, and I was hit and knocked clear out there; the bunch was coming in from all around; they had piled out there, you know. Q. How many do you think piled out of that school-house, outside? A. Well, I couldn't tell how many came out of there right then,

but they was a lot of them came out of there; they was all around there. The way I seen, they made a ring around there. Q. Did you see Fred out there when you went out of there? A. No, sir. Q. Or Melvin Allen? A. No, I didn't. Q. Or Ed Barber? A. No, sir. Q. Or Oliver Barber. A. I never seen anyone, I knew. Q. So you were pushed out, you say? A. I was knocked out. I was knocked as far as from here to that over there (indicating), out in front of the door. Q. Where were you hit? A. Right between the shoulders. I dropped on both hands, and I raised up, and they were all around in front of me, and somebody said, 'we will kill the sons-a bitches.' I started to run, and they was five or six in front of me, and the fight started in; I hit two or three of them, and I got cut in the arm, and I guess I was knocked down. I didn't know I was knocked down, but I knew when I got up. I started to crawl out of there after I came to. After I came to, I was cut in the shoulder here. They cut me in here (indicating). I knew something happened when I was hit across the back, but I didn't know what it was. I felt the blood running down my hands, and I knew I was cut, and I started to go out of there, I had had plenty. I just started out of there and I was hit on the head with something like a shovel, I didn't exactly know what it was, but it knocked me out. Q. You were trying to get away? A. Yes, sir. And there was a bunch of people around. Well, when I got up from there, I run, and somebody cut me in the leg. And then I ran from him and I got hit from another one, hit me from the right and knocked me down. They jumped on me and started to stomp me."

Concerning the same incident, Vernon testified as follows: "Q. And how did he take him out? What happened at that time? A. Well, he grabbed him—Mac grabs Fred in here (indicating), and pushes him out the door. And I went out and Mac was standing down over him, bending down over him, and holding him like that (indicating). I walks up and takes hold of his left arm—

Q. Whose left arm? A. Mac's. I says, 'Mac, don't hurt him; I can take him away.' Mac turns around and goes right back in the house. I reached down and picks Fred up, and takes a step or so towards the car to go home. Here comes Leonard Carter from the north of the house, and Fred was telling him, he says, Mac, the son-of-a-bitch, kicked me between the legs, and Fred held up his knife, and he said, I stuck that in the son-of-a-bitch's leg. About that time here comes a bunch rushing out of the house. Melvin Allen was in the lead. He says, Which of you sons-a-bitches cut Mac? And I says, Don't start any trouble; we will go home. About that time, somebody hits me between the eyes here (indicating). I goes down on my back. When I gets up there was a bunch to the front and to the right of me. And I said, I told Mr. Allen, fellows, I will go home. Here at the front and to the left of me, stood a man with a shovel, he hit me on top of the head. I goes down on my hands and knees. Q. Do you know who that was? A. No, I don't. Q. Well, what happened then? A. Well, I tried to start out— Q. Was anyone kicking you? A. Yes, that is right. I was kicked from both sides. And as I was starting, somebody catches me by this coat sleeve, right coat sleeve. I broke loose, and went south and goes under the fence there."

The testimony of the two brothers emphasizes what clearly appears from the prosecution's case, namely, that some thirty or forty men, incensed, angry, perhaps understandably, Fred's alleged conduct considered, were disposed to regard all the Winberns unfavorably, and, rather than to hold Fred for the "law," as subsequently they did, and moved by their uncontrolled impulses, and threatening to "kill the sons-of-bitches," did attack the three brothers, two of whom, including defendant here, so far as appears, had not offended. It is clear, too, at least there is evidence to that effect, and it did not come only from the Winberns, that defendant here and Vernon were endeavoring to get away, and had expressed

their purpose to take Fred home. Had the crowd been able to restrain itself, not so easily done, but legally required nevertheless, the major tragedy that finally resulted would have been averted. In connection with the leg-cutting incident, as is worthy of mention, Fred said that before he cut McAtee's leg, the latter had "kicked him between the legs." The jury that tried Fred soon after the event (he did not depart the jurisdiction), as already stated, did not find that even he was in the wrong, for he was acquitted.

I would not be misunderstood. As previously stated, it is not my thought that the case should not have gone to the jury. What I maintain is, that the record is pregnant with so much of uncertainty as to the facts, and the penalty involved is so severe, that well recognized rules of criminal procedure required instructions in keeping therewith. Trial counsel for defendant, although appointed, should have been alert; but their failure justly may not be visited upon the unlettered and indigent farm and timber hand whose life was at stake. The requirement of the law is that the trial court shall instruct the jury in accordance with the law of the case. Of course, counsel for both sides should be alert and helpful, and in criminal cases it is the bounden duty of the district attorney to suggest and promote correct instructions, and prevent, if he may, the giving of incorrect or unsound ones. But regardless of the duty of counsel, and however they may fail therein, in finality the responsibility rests upon the court. The office of a court of review is to examine as to what the trial court has done, or failed to do, not what counsel, for whatever reason, or lack thereof, has done or neglected. The foregoing is recognized in the cases cited early in this opinion, as well as in a multitude of other pronouncements not cited, all of which are to the effect, that regardless of counsel's oversight we should examine. Of course, in civil cases, where only the parties are interested, and in which the public, at most, is only incidentally concerned,

the rule is that the parties and their counsel, generally, should be bound by what they did, or failed to do, below. Even in such cases, in rare instances, error clearly appearing, and proceeding in the interest of sheer justice, courts of review have examined. But in criminal prosecutions, where the people, proceeding in their majesty, are engaged in the solemn duty of making inquiry and determining whether one of their number shall be deprived of his life or liberty, as here, only the most heedless of them would lightly regard the age-old requirement that the trial should be in accordance with the well established and humane rules of criminal procedure. In furtherance thereof, judges of trial courts should ever be alert, and failure there should move reviewing judges to appropriate action. In a criminal prosecution, counsel for the defense should be, and usually is, mindful of his client's legal rights, and barring infirmities inherent in all men living in an imperfect world, constantly would be alert, recall every rule, and not only not fail in anything calculated to advance his client's rights in the course of the trial, but should preserve a record that would enable him, or other counsel, to challenge as to every error specified for review. Not only so, but in criminal prosecutions, unlike in civil cases, the district attorney also is charged with the duty of seeing that the rules of procedure are observed, and that the trial is fairly conducted. In actual practice, however, as I learned in many years at the bar, district attorneys, generally, find it consistent to leave that feature of the procedure to defendant's counsel and the court. The sum is, that, in finality, the trial judge is responsible for the conduct of a trial, and in criminal cases, particularly where life is at stake, as here, not only is he required to instruct in relation to the issues, but his instructions must be free from prejudicial error. Notwithstanding "defendant's appointed counsel interposed no objection, * * * and [that] we are not required to consider objections not made below, nevertheless," as

we said in *Reppin v. People, supra,* "we may, and sometimes do, consider such objections when we feel that a seriously prejudicial error was made and that justice requires such consideration." Clearly, as I conceive, if ever the rule to examine notwithstanding oversight of counsel at trial, and my conception of justice and common humanities would move me to such action in any case where life or any considerable incarceration were involved, the record here should prompt that procedure. Prejudicial error in cases involving life or deprivation of liberty, whenever or however detected, and in whatever court pending, should not fail of consideration and just disposition. The rules of criminal procedure, their background, their office in man's scheme of justice, their inspirational force, their all but divine conception, appeal to all well-meaning men, and in trials of persons charged with punishable offenses, the observance of those rules should be the enlightened concern of those who, briefly, and in turn, are set apart to judge of the deeds of their fellows. Indeed, as the Supreme Court of the United States has said, "The history of liberty has largely been the history of observance of procedural safeguards." *McNabb v. United States,* 318 U. S. 332, 63 Sup. Ct. 608, 87 L. Ed. 819.

Before discussing the instructions, I advert to a feature of the court's opinion which is to the effect, that, since "Defendant testified definitely and positively that he had no knife, and that he did not stab deceased, * * * he has no grounds for complaint as to instructions given on self-defense." In support thereof, *Kelly v. People,* 17 Colo. 130, 29 Pac. 805, is cited. As stated there, "The crime of which defendant was accused was committed before the passage of the act of April 19, 1889, which made some changes as to the time, place and other incidents pertaining to the infliction of the death penalty; but the trial did not occur until after such act had taken effect. In *Tyson's case,* 13 Colo. 482 [22 Pac. 810], this court held that the changes in the statute were not suffi-

·cient to render the act *ex post facto*. But in the *Medley and Savage Cases,* 134 U. S. 160, 176, the Supreme Court of the United States (Justices Brewer and Bradley dissenting) took the opposite view; and so Medley and Savage, though duly convicted of murder of the first degree in this state, were set at liberty. In view of these decisions of the highest judicial tribunal of our country, the district court of El Paso county acted wisely in charging the jury not to convict Kelly of a crime so heinous that he would escape punishment altogether. The life of a criminal statute is its sanction, or penalty. The decisions in the *Medley and Savage Cases* virtually declared that the crime of murder in this state could not rise to the grade of first degree, if committed prior to the act of 1889, *supra.* The district court, therefore, did not err in limiting the conviction to murder of the second degree." It is clear from the opinion in the Kelly case, and the record thereof, which I have been at pains to examine in detail, makes such conclusion doubly certain, that defendant there, if he was to be convicted of murder at all, wished it to be in the first degree, so that he might enjoy the benefit of the United States Supreme Court decision in the Medley and Savage Cases, supra, and be set at liberty at once. There, the language of the instruction of which Kelly complained, read as follows: "The court, however, as matter of law, instructs the jury that you cannot, in the present state of our law, convict defendant of murder of the first degree, so that the attention of the jury must be confined to murder of the second degree." Commenting thereon, we said there, that, "The immediate connection in which this language was used clearly shows that it was employed to prevent the jury from convicting defendant of murder of the first degree, as above explained." There, as here, defendant denied that he used a knife, but there the evidence showed that defendant, armed with the knife shown to have been used in slaying the deceased, pursued and killed his victim as he fled and was begging that his life

be spared. Here, as there was evidence to show, defendant, himself up to that time free from wrongdoing, was threatened with death, attacked and beaten by overwhelming numbers, as he was endeavoring to get away. An element of his defense, although he denied having or using a knife, was that he was acting in self-defense, while in the Kelly case, as we said there, "It was not contended in behalf of defendant that he struck Phillips in self-defense." The difficulty there was between Kelly and his lone victim, the latter fleeing as he was pursued and slain. The sum of our holding in the Kelly case was to approve the district court's rulings in thwarting the defendant's efforts, as already stated, to be convicted, if at all, of murder in the first degree. I submit that the Kelly case was wholly different, and is not in point on this review. It is inexcusably wrong, as I think, for us, predicating our holding on the Kelly case, not cited or relied on by the Attorney General, to deny defendant here the right to have a proper instruction on self-defense.

Instruction number 18, challenged here by counsel for plaintiff in error, I now set forth. For convenience of reference and consideration, I italicize the last sentence of the instruction, save only the last clause thereof, which I capitalize. As thus emphasized, it reads: "You are further instructed upon the subject of self-defense, that where a party in the lawful pursuit of his own business is attacked by another in such a manner and by such means as to induce in the minds of a reasonable person the belief that he is in danger of losing his life or suffering great bodily harm from such attack, and the person so attacked does honestly believe, in good faith, that he is in danger of losing his life, or suffering great bodily harm from such attack, then he is justified in using such force as honestly appears to him to be necessary to repel such attack, even to the extent of taking the life of his assailant; such is the law even tho the danger is not real but only apparent, if it were of such char-

acter and in such a manner as to convey the belief to a reasonable man that there was real danger, and the assaulted party did so honestly believe; and in such case, gentlemen, the party assaulted is justified in taking such steps, and pursuing his assailant to that extent as will put him, the party assaulted, beyond the reach of harm. *In order to properly apply these principles of self-defense, so as to determine the guilt or innocence of the defendants, you may, so far as possible and in your power, place yourselves in the same position in which the defendants were placed, as shown by the testimony, and surround yourselves by the same circumstances by which they were surrounded,* AND THEN SAY WHETHER, ACTING AS A REASONABLE PERSON, WITH A PROPER REGARD FOR HUMAN LIFE, YOU WOULD HAVE DONE AS THEY DID."

Obviously, as I think, the instruction is indefensible, inexcusable, prejudicial, and wholly without precedent. "The true test," says the Supreme Court of Illinois, "is what the defendant believed was necessary, acting as a reasonable man, not whether the jury believed from the evidence that it was necessary or apparently necessary." *People v. Clark,* 368 Ill. 183, 13 N. E. (2d) 269. We have said that "taking into consideration the circumstances and * * * surroundings at the particular instant of time," the question is, would they "lead a reasonable and prudent man to use a weapon under like circumstances for protection?" *Henwood v. People,* 57 Colo. 544, 143 Pac. 373. See, *Young v. People,* 47 Colo. 352, 107 Pac. 274; *Selfridge v. People,* 45 Colo. 275, 100 Pac. 591; *Boykin v. People,* 22 Colo. 496, 45 Pac. 419. "The instruction is erroneous in making the jury and not the defendant the judge of whether or not he was in danger at the time of the shooting and whether or not it was reasonably necessary for him to shoot in order to avert the danger, real, or to him apparent." *McClain v. Commonwealth,* 284 Ky. 359, 144 S. W. (2d) 861. See, also, *Poe v. Commonwealth,* 244 Ky. 649, 51 S. W. (2d) 937; *Ayers v. Commonwealth,* 195 Ky. 343, 242 S. W. 624.

Where the instruction "permitted the jury, rather than the defendant, acting without fault or carelessness, to determine whether it was necessary to fire the second shot," it was erroneous. *Mills v. State*, 168 Ark. 1005, 272 S. W. 671. The portion of the instruction in the present case which I have italicized, instead of telling the jury to consider the "position in which the defendants were placed, as shown by the testimony," and whether in the light thereof, defendants, acting as reasonable men, believed that what they did was necessary, the jury was told to "surround yourselves in the same circumstances by which they were surrounded," and, then, instead of telling the jury to determine, whether, the circumstances considered, defendants acted as reasonable men the court concluded the instruction in the words I have capitalized, thus, "AND THEN SAY WHETHER, ACTING AS A REASONABLE PERSON, WITH A PROPER REGARD FOR HUMAN LIFE, YOU WOULD HAVE DONE AS THEY DID." Counsel for defendant rightly urge that by this instruction, the court erroneously submitted the test subjectively rather than objectively. Webster says that subjective is, "Of or pertaining to whatever in experience or knowledge is conditioned by merely personal characteristics of mind, or by particular states of mind, as opposed to what is determined only by * * * universal conditions of human experience and knowledge; hence, sometimes, not reliable; invalid, as a *subjective* evaluation." But he defines objective as, "Belonging to nature or the sensible world; independent of what is personal or private in our apprehension and feelings; such that rational minds agree in holding it real or true or valid. Objective means that which belongs to, or proceeds from, the object known, and not from the subject knowing. Emphasizing or expressing the nature of reality as it is apart from self-consciousness, treating events or phenomena as external rather than as affected by one's reflections or feelings; expressing facts without distortion from one's personal feelings or prejudice. Perceptible to the senses or de-

rived from sense perception, as *objective* data." Proceeding on the challenged instruction, couched subjectively, as it is, was as if the court had asked the jury whether, acting reasonably, "with a proper regard for human life, you would have done as" defendant did? What juror, so queried, I submit, would, or could, answer in the affirmative? None, or, so rarely would one do so, as to be negligible. No man, of promptings fitting him for jury service, considering himself apart, could bring himself to believe, that, whatever the circumstances, he would slay a fellow human. And that was not only the precise question, but the only one, tendered to the jury here. Manifestly, the instruction was grossly wrong.

In the light of the testimony, plaintiff in error was entitled to an instruction on his claim that he was acting in self-defense. *Payne v. People,* 110 Colo. 236, 132 P. (2d) 441. There, Mr. Justice Burke approvingly quoted from *Jabbich v. People,* 58 Colo. 175, 143 Pac. 1092, as follows: "No matter how improbable or unreasonable the contention, defendant was entitled to an appropriate instruction upon the hypothesis that it might be true." The instruction given, number 19, is wholly negative in expression, and proceeds on the theory that the burden in relation to the contention is upon the accused. Not only so, but the instruction specifically states that "it must appear also that the person killed was the assailant." Considering that it was a wild fight in the night, with some thirty or forty men on one side, and only three men, and one of them hopelessly drunk, on the other, the quoted language is unfairly restrictive. "The law is," says the Kentucky court, "that one in apparent danger at the hands of others acting in concert has the right to use such means as is necessary or reasonably appears to him to be necessary to avert the danger and to fire in his own defense at any of his assailants. When the evidence tends to establish that condition, the court should so instruct the jury. It is error to limit the exer-

cise of his right of self-defense only against the person who is killed or wounded, as the case may be." *Scott v. Commonwealth,* 289 Ky. 436, 159 S. W. (2d) 13. I now quote the instruction challenged here. It reads: "You are further instructed, upon the law of self-defense, that a bare fear of any of these offenses, to prevent which the homicide is alleged to have been committed, shall not be sufficient to justify the killing. It must appear that the circumstances were sufficient to excite the fears of a reasonable person and that the party killing really acted under the influence of those fears and not in a spirit of revenge or malice. If a person kills another in self-defense, it must appear that the danger was so urgent and pressing that in order to save his own life or to prevent his receiving great bodily harm the killing was absolutely necessary; and it must appear also that the person killed was the assailant, or that the slayer had really and in good faith endeavored to decline any further struggle before the fatal blow was struck."

It is clear, I think, that plaintiff in error did not have a fair trial, in consideration whereof the judgment should be reversed and a new trial granted. In addition thereto, I pause to add that the inquiry here presents rare opportunity for the announcement of wholesome rules in criminal procedure, not availed of by the court, which I regret.