No. 16,125.

SMITH *v.* THE PEOPLE.
(206 P. [2d] 826)

Messrs. MOYNIHAN - HUGHES - SHERMAN, for plaintiff in error.

Mr. JOHN W. METZGER, Attorney General, Mr. JOSEPH E. NEWMAN, Acting Deputy, Mr. RAYMOND B. DANKS, Assistant, for the people.

*En Banc.*

MR. JUSTICE MOORE delivered the opinion of the court.

PLAINTIFF in error, to whom we hereinafter refer as defendant, was named defendant in an information filed in the District Court of the City and County of Denver in which it was alleged that defendant on September 30, 1946, "did unlawfully, feloniously, wilfully, deliberately, and of his premeditated malice aforethought, kill and murder one Dr. James Mullen."

Defendant entered his plea of not guilty "by reason of insanity at the time, since and now." Trial of the issues resulted in a verdict of guilty of murder of the first degree with the penalty fixed at imprisonment for life. Motion for new trial was argued and denied and sentence was imposed on August 23, 1947. On August 3, 1948, defendant filed a supplemental motion for new trial on the alleged grounds of newly discovered evidence. This motion was supported by an affidavit of Katherine E. Smith which set forth that the defendant was transferred from the state penitentiary to the Colorado State Hospital at Pueblo, Colorado, on the 30th day of January, 1948, in accordance with the terms and

provisions of section 27, chapter 105, '35 C.S.A., and that pursuant to said statute defendant was observed by the hospital officials and that the Governor of the State of Colorado, acting upon the report prepared by the hospital authorities, ordered defendant transferred to the said State Hospital at Pueblo, "where he is now confined and kept." Affiant further stated that the physicians of the state penitentiary and of the Colorado State Hospital "have now found and determined that the mental disease and condition of the said Ronald Frederick Smith has now developed to the point where they recognize and have found that the said Ronald Frederick Smith is insane;" that if a new trial is granted this evidence will be available and would disclose that the mental disease of the defendant, "which he had at the time of the commission of the act, for which he has been convicted herein, has so progressed as to constitute almost conclusive evidence that the defendant was insane at the time of commission of the said act." Defendant's motion was further supported by the affidavit of Dr. Edward Delehanty, a psychiatrist, who therein stated that he examined the defendant on the 14th day of May, 1948, that the defendant was insane, and that his said examination "evidences the existence of such a disease [delusional psychosis] on and prior to the 30th day of September, A. D. 1946;" and that in the opinion of affiant defendant was insane on said last mentioned date. The District Attorney moved to strike said supplemental motion, and, on hearing, the defendant's motion was stricken.

Briefly stated, the facts in the case are as follows: The defendant was a police officer of the city of Grand Junction, Colorado, and on September 30, 1946, he came to Denver for a physical examination by the Veterans Bureau. He reported to said Bureau for examination which was concluded at about 2:30 P.M. on said date. He then visited the Knickerbocker bar, the Ship Tavern, and the bar at the Shirley Savoy hotel, at each of which

places he consumed a quantity of alcoholic liquor. He returned to the Ship Tavern, and, in conversation with patrons, stated that he had to catch a 5:00 o'clock train and apparently left for that purpose. A short time later he returned to the Ship Tavern commenting that he had missed his train.

Phillip Van Slyck entered the Ship Tavern about 5:30 P.M. and seated himself on a stool at the bar, to the immediate left of defendant. Dr. Mullen the victim in the offense charged, was sitting to the right of defendant, and people's witness Willis Arter sat next to Dr. Mullen and to his right. Prior to the arrival of Van Slyck the defendant engaged Dr. Mullen and Arter in conversation. Arter stated that it was apparent from the conversation that defendant was a "little bit high." The witness Arter was a sergeant major in the marine corps. Sergeant Arter stated, concerning the condition of defendant as to sobriety, "Well, he was all right. He could talk all right and walk all right. He was a little bit loud. He was out of place in a place like that." He further stated, "Oh, he wasn't drunk, no. * * * He was kind of playful, having a good time and enjoying himself. He was smiling just like a man who had had a couple of drinks." Upon the entry of Van Slyck defendant directed his conversation to him and shortly thereafter the shooting started, resulting in the death of Dr. Mullen. The defendant was "cursing and swearing the majority of the time—just using it in his conversation." Defendant was subdued by patrons of the tavern after a struggle in which he received a beating. However, no provocation appears at any point in the record justifying the defendant's using his revolver, and any force applied to him took place only after the shooting had commenced.

In view of the contentions of defendant, we quote from the evidence of people's witness Van Slyck, as follows: "Then he said to me, 'You are wanted by the law in Grand Junction, aren't you?' I said No. He in-

sisted he had seen me either in Grand Junction or some place else sometime before that night. Then he turned away from the bar and indicated a table behind us where two young ladies were sitting and said, 'Why don't you ask that blonde dame for a date? You shouldn't have any trouble getting a date.' Q. Was there a blonde girl sitting there? A. Yes, there was. Q. All right. A. And then he said, 'I'll bet you are older than I am,' or words to that effect. I said, 'How old are you?' I said, 'I am twenty-six.' He said, 'Christ, you're an old man. I'm only twenty-three.' So he said something to the effect, 'We're going to have a big time tonight.' I explained that I had a dinner engagement at quarter after six and had to leave. So he tried to buy me a drink. I told him I didn't have time for a drink. He tried to pay for the beer which I was drinking. I thanked him and refused. Q. You refused to take the money, is that it, or— A. Yes, sir. Q. All right. A. Then he turned to me and said, 'You are just like all the rest of them.' He said, 'You would turn me in in a minute if you got a chance.' And I tried to pass it off as well as I could. I didn't want to lead him on. I didn't understand what he was driving at. He said, 'Go ahead and turn me in.' I said, 'Whom do you want me to turn you in to?' He said, 'You know who, that fellow over there you just gave the high sign to.' "

\* \* \*

"Q. Was that after you had refused to have him buy a beer? A. Yes, that was after, and, of course, I had no idea whom he was talking about; I hadn't been paying any attention to anyone at the bar,— Q. Just relate what actually happened. A. All right. So then he whipped out his revolver and gave it to me. Q. Did he let go of it, hand it to you? A. Yes, he did. Q. All right. What happened then? A. He said, 'Go ahead and shoot him.' Q. Meaning whom? A. Smith said, 'Go ahead and shoot him.' I said 'Shoot whom?' He said, 'You know who.' So I laughed and passed the revolver

back to him. I said 'You'd better put it away before somebody gets hurt.' So instead of putting it away he stuck it in my ribs and he said, 'You s.o.b., you haven't got any guts.' Q. Now, use the exact words. I think these people won't mind too much. When you say s.o.b. what do you mean? A. He said, 'You son-of-a-bitch, you haven't got any guts.' Q. All right. A. I was looking him straight in the eye. I laughed at him, and he said, 'Don't laugh at me, you son-of-a-bitch, this gun is loaded.' I said, 'I know it is loaded.' So he took it out of my ribs and held it in front of me and broke the cylinder so I could see that the gun was loaded."

Van Slyck then stated in substance that he removed one cartridge from the cylinder of the gun and closed the cylinder so the empty chamber was under the hammer of the gun. He advised defendant to put the gun away. Van Slyck testified further as follows: "Suddenly he spun around again and faced me and talked very rapidly and he said, 'This is all a dream,' he said, 'isn't it nice that way? I could shoot you right now and nobody would know it. Nobody in here would even remember. I am going to do it, too.' He said, 'You're a nice guy, I like you and you like me, but you're going to die tonight.' Q. He said what? You're going to what? A. 'You're going to die tonight.' With that he whipped out the revolver again, cocked it, and put it in the pit of my stomach. I reached for it, grabbed the revolver by the barrel, raised it straight up from my stomach up over my left shoulder, at which time it went off. * * *" In the struggle that followed, Van Slyck lost his grip on the gun, fell backwards on the floor, and four additional shots were fired at him after he fell. Some of these shots passed through his coat but none of them hit him. One of the shots fired by defendant struck Dr. Mullen in the left chest, entered the left lung, and fractured the left clavicle and the fifth cervical vertebra. He died before the police surgeon arrived.

The witness, William R. Johnston, a captain in the

United States Army, was present in the Ship Tavern prior to and at the time of the shooting. He testified that deceased swung off the stool at the bar at about the time the shooting started; that defendant was standing with the gun in his hand, that he pulled the trigger twice; that the gun pointed in the direction of deceased, and that he knows the second shot struck the deceased because deceased "gasped and came to the floor then."

The witness Leavitt, a city detective, questioned defendant about four hours after the shooting, and defendant stated to him that he had been examined by the Veterans Bureau during the forenoon and in the early part of the afternoon; that he went to the Knickerbocker bar, the Brown Palace, the Shirley Savoy and back to the Brown Palace; that he had missed his train to Grand Junction and thereupon returned to the Ship Tavern at the Brown Palace; that he got into conversation with Van Slyck, "and then the next thing he knew he was strapped to a bed at the receiving hospital." Detective Leavitt further testified: "Sergeant Burns then asked him, * * * 'Don't you remember of any shooting at the Brown Palace?' and he said, 'It seems very hazy to me.'"

James E. Childers, captain of detectives, testified that he interviewed defendant on October 1, at 11:00 o'clock A.M., and that defendant told substantially the same story previously related concerning his activities prior to the shooting. "He said the next thing he remembered he drew his gun and placed it in the side of the man on his left, and this man laughed about it, and the next thing he remembered was someone bending his finger back on the trigger guard of the gun."

Dr. John M. Lyon, a psychiatrist, examined the defendant at the Colorado Psychopathic Hospital and attended the trial. He expressed the opinion that defendant was sane at the time of the shooting and since. To like effect was the testimony of Dr. Franklin G. Ebaugh

and Dr. Stuart K. Bush, specialists in the field of nervous and mental diseases.

The evidence offered by defendant tendered no material issue of fact except concerning his mental condition. Dr. Leo V. Tepley and Dr. J. P. Hilton, qualified psychiatrists, testified that in their opinions the defendant was insane on September 30, 1946, and that he was insane at the time of the trial. They further stated that upon the date of the alleged offense, and at the time of the trial, defendant could not distinguish between right and wrong or choose the right and refrain from doing the wrong. Each of the specialists called on behalf of defendant explained at great length the basis for his opinion.

Counsel for defendant, who did not participate in the trial and who appear in this cause for the first time upon the filing of the supplemental motion for a new trial above mentioned, contend as a basis for reversal that the evidence was insufficient to sustain the verdict; that the court erred in refusing to permit lay witnesses to express opinions concerning the sanity of the defendant; that reversible error was committed by the refusal of the trial court to grant the supplemental motion for a new trial based upon newly discovered evidence; and that the court erred in refusing to submit the question of involuntary manslaughter to the jury.

### Questions to be Determined.

First: *Does the evidence introduced upon the trial sustain the verdict?*

This question must be answered in the affirmative. It is contended by counsel for defendant, in substance, that the conduct and conversation of defendant immediately prior to and at the time of the shooting evidence a total loss of reason and a total irresponsibility on his part. They further contend that, as a matter of law, the evidence can only properly be interpreted as proving insanity.

■ ■ In our opinion there was abundant evidence to establish every essential element of the crime of which defendant was convicted. The conduct of defendant generally, which, it is contended, is wholly inconsistent with his sanity, is hereinbefore fully set forth. The psychiatrists called by the people were asked specifically as to whether such conduct indicated the presence of an insane mind and they answered that such conduct, considered in the light of the whole evidence, did not indicate the presence of insanity. We think the evidence establishes the ability of defendant to form a premeditated intent to kill at the time of the shooting. The existence of such an intent in the mind of defendant was expressed when he informed his intended victim, Van Slyck, "You're a nice guy, I like you and you like me, but you're going to die tonight." While the defendant was to some extent under the influence of intoxicating liquor, there is ample evidence to sustain the finding of the jury that he was capable of forming a design deliberately and premeditatedly to kill. Voluntary drunkenness is no legal excuse for a crime perpetrated under the influence of intoxicating liquor unless its effect is to destroy the ability of the accused to form a specific intent, the existence of which is an element of the offense charged. The undisputed evidence disclosed by this record shows a deliberate and intentional killing by one who not only was capable of forming an intent to kill, but who in fact gave expression to the formation of that intent. Upon the issue of sanity or insanity there was conflicting evidence upon which the jury found that the defendant was sane. The contention of the defendant that the evidence does not support the verdict is overruled.

Second: *Did the trial court err in sustaining objections to a question directed to a people's witness on cross-examination which called for the opinion of the witness concerning the sanity of the defendant?*

■ ■ During the cross-examination of police of-

48

ficer W. H. Ohruh, defendant's attorney asked a question calling for the opinion of the witness as to whether defendant was insane. There is no indication in the record that the witness had ever seen the defendant before the night in question, and all the opportunity he had of forming an opinion, was his observations at the Ship Tavern following the shooting and en route to the Denver General Hospital. The trial court indicated that this witness, and any other witnesses "under similar circumstances," was not qualified to express an opinion concerning the sanity of defendant, in that under such circumstances the witness was not sufficiently acquainted with defendant to express an opinion upon the subject. The District Attorney objected to the question upon the further ground that it was not proper cross-examination, since in no instance had any such witness been questioned concerning the sanity of defendant upon his examination in chief.

In the case of *State v. Schneider,* 158 Wash. 504, 291 Pac. 1093, the correct rule to be applied was stated as follows: "It is unquestionably the rule that, before non-expert testimony as to the mental condition of a party to an action may be rendered competent, the witness must show an acquaintance with the party concerning whose mental condition he is testifying, of such intimacy and duration as to clearly indicate that he was well enough acquainted with such person to render his testimony of value in determining the issues presented for decision; and he must also testify as to the certain specific acts of such person which form the basis for his conclusion as to the mental condition of such person." In *McGonigal v. People,* 74 Colo. 270, 220 Pac. 1003, this court held that a wide discretion is necessarily vested in the trial court to determine the sufficiency of the acquaintance of a lay witness with the accused as a prerequisite to the reception in evidence of an opinion on the question of sanity. In *Turley v. People,* 73 Colo. 518, 216 Pac. 536, we stated: "A non-expert witness may never,

in response to purely hypothetical questions stating the facts, be permitted to give an opinion on the question of sanity. But by the great weight of authority one who, in the opinion of the trial court, shows adequate means of becoming acquainted with the person whose mental condition is in issue, after detailing the facts and circumstances concerning his acquaintance and the acts, conduct and conversation upon which his conclusion is based, may give his opinion on the question of sanity. The weight of that opinion is for the jury."

Whether a lay witness may express an opinion as to sanity of a person rests within the sound discretion of the trial court. There is no abuse of discretion in refusing to permit a lay witness to express such an opinion where such witness did not see or know the defendant until immediately after the commission of a crime, and who was with defendant only for a very short time thereafter. The trial court specifically stated that his ruling applied to all witnesses "under similar circumstances" to those presented by the witness Ohruh. His ruling did not exclude the testimony of lay witnesses who might be acquainted with the defendant more closely, and for such duration, as to qualify them to express an opinion on sanity. No further offer of proof was made. No lay witnesses were called by defendant to give an opinion concerning his mental condition. Even though some of the witnesses called by the people might have been able to show sufficient acquaintance with defendant to express an opinion on his sanity, defendant could not, on cross-examination, secure this opinion unless the witness had been questioned with regard thereto in his examination in chief. *Carter v. People,* 119 Colo. 342, 204 P. (2d) 147.

The question under discussion must be answered in the negative.

Third: *Did the trial court err in striking the supplemental motion for new trial for lack of jurisdiction to entertain the same, which motion was filed after the*

*expiration of the term within which the judgment was rendered?*

After much discussion and argument the trial court disposed of defendant's supplemental motion for new trial and the motion of the district attorney to strike the same, by the following statement: "The motion to strike will be sustained, and the motion of the defendant for a new trial on the ground of newly discovered evidence is dismissed. Let the record show that I have dismissed the case for lack of jurisdiction."

In *Klink v. People*, 16 Colo. 467, 27 Pac. 1062, we stated: "There must be an end to criminal as well as civil proceedings. After the final disposition of the case and the lapse of the term, the court had no jurisdiction to entertain the application in question. If this motion could be heard, there would be nothing to prevent a repetition of similar proceedings at each and every subsequent term during the punishment of a convicted party."

In *Saleen v. People*, 41 Colo. 317, 92 Pac. 731, we stated concerning a similar motion: "If, after the trial, the defendant discovers new evidence and convinces the court that he has been unjustly convicted, the court may grant him a new trial. If, after sentence and within the term, he produces new evidence and shows the court that he has been unjustly convicted, the court may even then grant him a new trial; but, if he relies upon newly discovered evidence to effect his discharge, and he applies to the court for relief after the term has expired, the court is without jurisdiction, and the judicial department is then closed."

It is contended by defendant that the case of *Turley v. People*, 73 Colo. 518, 216 Pac. 536, justifies this court in adopting a different rule than that quoted from the Saleen case, in that in the Turley case we stated: "A motion for new trial must be filed within the time limited by statute, or order of court, and an application for extension of time within the same limits. Other-

wise they cannot be considered. * * * The reason being the same in criminal cases as in civil the rule is the same."

It is then argued that, since by rule 59 (b) of the Rules of Civil Procedure, a motion for a new trial on the ground of newly discovered evidence may be made at any time before the expiration of the time for writ of error, with leave of court obtained on notice, there should be an enlargement of the time within which such a motion could be entertained by the trial court in a criminal case. Counsel for defendant, with considerable justification, ask why a year's time within which to file a motion for new trial on the ground of newly discovered evidence is authorized in a case involving only property rights, and is denied in a criminal case involving life imprisonment. The only answer to this question is that the law as declared and interpreted over many years is well established, and our function is to declare the law as we find it. If a change in long established judicial precedent is desirable, it is a legislative and not a judicial function to make any needed change. Adoption of the Rules of Civil Procedure did not bring about any change or modification of the practice in criminal cases. The rule announced in *Saleen v. People, supra,* was again invoked in the case of *Milow v. People,* 89 Colo. 469, 3 P. (2d) 1077. In that case, the term within which the judgment was rendered and sentence pronounced, expired on the 9th day of September, 1930. Two days thereafter the defendant filed a supplemental motion for a new trial based upon newly discovered evidence. The trial court granted the motion of the district attorney to strike the supplemental motion because it was filed too late, and for the reason that the court was without jurisdiction to hear, consider and determine the same. This action of the trial court was upheld. Thus we find that subsequent to the case of *Turley v. People, supra,* the rule in the Saleen case has been reaffirmed. Again, in the case of *Dockerty v.*

*People,* 96 Colo. 338, 44 P. (2d) 1013, we quoted with approval the rule announced in the Saleen case. It necessarily follows that the interpretation of the Turley case, for which counsel for defendant contend, is untenable. Moreover, an examination of the supplemental motion for a new trial, and the affidavits supporting said motion, leads to the inescapable conclusion that the alleged newly discovered evidence was only cumulative in character, and the trial court so considered it. Under such circumstances, even though the court had jurisdiction to entertain the motion, it would have been properly denied by the court upon that ground.

The question under discussion is accordingly answered in the negative.

Fourth: *Did the court err in refusing to submit the question of involuntary manslaughter for the consideration of the jury?*

 The jury should not be instructed with regard to lesser included offenses in a prosecution for murder unless there is some evidence to support a verdict of guilt upon such lesser offense. *Jones v. People,* 93 Colo. 282, 26 P. (2d) 103.

In the case at bar the defendant was the aggressor at all times. No one else was armed. Those who struggled with defendant were endeavoring to disarm him. The case of *Taylor v. People,* 77 Colo. 350, 237 Pac. 159, closely parallels the one at bar. In that case we said: "It is urged that there was error in the refusal of the court to give defendant's requested instruction on involuntary manslaughter. There is an absence in the record of any act of violence, or of an assault, or even the use of language provocative of ill temper, prior to the firing of the shot that killed Brunts, except only the acts and language of the defendant himself. There being an entire absence of evidence tending to establish involuntary manslaughter, there was no error in refusing to give the instruction tendered by the defendant."

Both at the trial, and in this court, defendant has

been ably represented by counsel of skill and experience. He has had a fair trial conducted in harmony with established rules of practice in criminal cases. We find no reversible error and, accordingly, the judgment is affirmed.