## No. 21010.

### DOROTHY BUSTAMONTE v.
### THE PEOPLE OF THE STATE OF COLORADO.
(401 P.2d 597)

Decided May 3, 1965. Rehearing denied May 17, 1965.

WILLIAM A. TRINE, ROGER E. STEVENS, for plaintiff in error.

DUKE W. DUNBAR, Attorney General, FRANK E. HICKEY, Deputy, AUREL M. KELLY, Special Assistant, for defendant in error.

*En Banc.*

MR. JUSTICE SUTTON delivered the opinion of the Court.

PLAINTIFF in error, Dorothy Bustamonte, hereinafter called defendant, was convicted by a jury of second degree murder following the shooting of one Charles M. Dyson. She was thereafter sentenced to not less than ten years nor more than fifteen years imprisonment at hard labor.

Defendant urges five grounds for reversal which can be summarized as follows, to-wit:

(1) The trial court erred in refusing to submit to the jury original numbered Instruction No. 14 on self-defense which was later tendered and refused as defendant's Instruction No. 1;

(2) It was error to admit in evidence on rebuttal, over objection, testimony of one Frank Bernal, as to an alleged similar event when she asserts that it in fact was a separate and distinct occurrence unrelated to the present issue;

(3) It was error to admit, over objection, certain evidence labeled as hearsay, which consisted of what the deceased had purportedly told a friend, Joseph Wolney, Jr., the morning of the shooting;

(4) It was error not to allow defendant to impeach as a hostile witness her witness Joseph Wolney, Jr.;

(5) It was error to submit charges of both first and second degree murder to the jury when allegedly no evidence existed to support a conviction thereunder, and the court erred in not directing an acquittal.

The record discloses the following pertinent facts, viz: defendant, aged 22 years, and Dyson, a dry wall contractor, were illegally cohabiting in Boulder, Colorado, from June 1962 to December 20, 1962. On December 19, 1962, the couple quarrelled and as a result it was agreed that she would leave. This was later followed by Dyson ordering defendant "to pack her things and he would take her to Longmont [where she formerly lived] the next day." That evening, she partially packed her belongings before Dyson came home intoxicated. On the morning of the 20th, Dyson left the house early with his friend Joseph Wolney, Jr. After defendant was sure he was gone, she arose and continued to pack until a Mrs. Ruth Neptune appeared to demonstrate some reducing equipment. Dyson returned soon thereafter, apparently somewhat intoxicated. He was angry and upset. He demanded that Mrs. Neptune let him see defendant who was then partially disrobed and sitting in a chair in a downstairs room where a relaxacisor machine was attached to her body. After some argument, Dyson entered the room in which the defendant was sitting, and shortly thereafter began to curse, strike and beat her; he pulled the machine from her body and threw it towards the door where Mrs. Neptune was standing. Being terrified at his behavior, Mrs. Neptune soon departed in haste. Following her departure, Dyson threw a suitcase at defendant and again cursed her. He then started to slap her, grabbed her hair, threw her to the floor, put his knee on her chest and beat her again. She finally freed herself and ran upstairs pursued by Dyson. He then chased and continued to beat her as she fled from what is described as the north bedroom to the south bedroom.

During the fracas upstairs, Dyson threatened to kill defendant, and at one stage he went back downstairs but soon returned and demanded to know where his guns were. It appears that he was a hunter and owned two rifles and a pistol — the latter always kept loaded — which weapons he had left downstairs to clean, but

which defendant had some time prior to the 20th taken upstairs to the north bedroom closet for storage. She testified that all the weapons were loaded then but that she had unloaded the rifles leaving a shell stuck in the chamber of one rifle. Fearing great harm from Dyson when he went downstairs, she took the pistol and put it on top of the dresser under a shirt, in the upstairs south bedroom. When he returned, she told him that it was in the closet in the north bedroom. Enraged at not having been able to locate it, he continued to strike her. She finally managed to escape to the south bedroom, after which she took the pistol from its hiding place and ran across the room. As Dyson came into the room after her, she told him to stop; but he tauntingly and threateningly continued to advance. She then fired the gun and the bullet hit his torso just above the pelvis; it, however, went through his body without striking any bone or vital part and apparently without any present effect on Dyson.

Following the first shot, Dyson said to defendant, "You are crazy," turned and started down the stairway which was just in front of the bedroom. Defendant testified that because she thought he was going to get some object with which to attack her she followed him to the top of the stairway and fired again when he was about halfway down the stairs. The second shot, which proved fatal, hit Dyson in the back of the head. It appears that at the time the only other weapon known to defendant was a bayonet which she had last seen downstairs in the kitchen; however, she did not recall where it was on this particular day.

After the shooting, and without knowing whether Dyson was dead, defendant fled to her grandparents' home in Longmont and told them what had happened. In due course she turned herself over to the police, cooperated fully in the investigation and gave them statements about the tragedy.

The undisputed testimony of Mrs. Neptune was that defendant had no bruises on her nearly nude body at the

time of the relaxacisor demonstration. There was also other undisputed testimony to the effect that she had numerous fresh bruises on her arms and on one thigh, as well as a tender spot on her chest, after the shooting.

With the above facts in mind we turn to the alleged errors.

■ First, as to defendant's requested instruction on self-defense which the trial court refused. This lengthy instruction attempted to encompass within its borders many statements of law applicable to facts in evidence. It assertedly and obviously was copied almost verbatim from an instruction which appeared in Mr. Justice Hilliard's dissent in *Winbern v. People,* 116 Colo. 136, 152-53, 180 P.2d 516 (1947). In *Winbern* the majority of the court refused to review this instruction on procedural grounds; and it certainly did not approve it. Mr. Justice Hilliard set it forth in *haec verba* and correctly remarked as to the final wording contained therein (i.e., letting the jury put itself in the place of the defendant) that it "* * * is indefensible, inexcusable, prejudicial, and wholly without precedent." He then discussed the instruction at some length and pointed out that the last part of it called for a subjective test by a jury and not an objective test. In the instant case the trial court was correct in refusing such an instruction when tendered.

■ The court did, however, submit to the jury its Instruction No. 13 in the statutory language relating to self-defense. In so doing it commented in effect that it felt this was all it should give in view of our decision in *Vigil v. People,* 143 Colo. 328, 353 P.2d 82 (1960) wherein we had stated that it was proper to give an instruction in the statutory form.

■ So there will be no future misunderstanding of *Vigil,* however, we point out that there a quoted and given instruction on self-defense was held to be improperly worded for reasons set forth and we merely commented "* * * it has been stated to be a good rule to couch instructions in the language of the statute * * *."

We did not thereby mean to imply that this is the only type of instruction that is proper. In fact, in *Leonard v. People,* 149 Colo. 360, 369 P.2d 54 (1962) we made it clear that a defendant is entitled to supplementary clarification when additional instructions are necessary adequately to inform a jury in a case; and, that instructions should be geared to the case being tried. In *Young v. People,* 47 Colo. 352, 355, 107 Pac. 274 (1910) we pointed out that a defendant has "a constitutional right to have a lucid, accurate and comprehensive statement by the court to the jury of the law on the subject of self-defense from his standpoint * * *." Thus, if the statutory instruction does not fit a particular case, or, if it is given and yet other supplementary instructions are needed to state a defendant's position, then such, when properly worded and tendered, should be submitted to the jury.

In the instant case the defendant tendered no supplemental instructions deemed necessary except the objectionable one described above. Since the trial court had performed its duty by the giving of Instruction No. 13 and the jury was thereby instructed as to self-defense in the applicable statutory manner, no error appears as to this issue.

As to the second point for reversal dealing with Frank Bernal's testimony, we face a different problem.

It appears that Bernal and defendant had once illicitly lived together for approximately three years in Longmont and that she bore him two children during that period. On rebuttal, over objection, Bernal was permitted to testify that approximately twenty months prior to the shooting he was vacating their abode for good; and that when he came with relatives to pick up his belongings, she stabbed him with a knife as he was leaving. At the time of the stabbing she was again pregnant, had no food in the apartment and had a baby to care for.

This testimony had first been offered in the People's case in chief to show intent or motive, but was rejected with the right to renew the offer at the close of defend-

ant's case. On rebuttal it was permitted by the trial court (under a limiting admonishment to the jury) for the limited purpose of showing *intent* but no motive. Such a showing of intent was important to the People's case because of prior testimony by one of defendant's witnesses, a Dr. Dean James Plazak, who appeared as an expert practicing neuro-psychiatrist. Dr. Plazak had testified that he had examined the defendant beginning on December 22, 1962, in regard to whether she was capable on December 20th of "forming an intent or design to kill Charles Dyson." His conclusion was that defendant did not have the ability to form such an *intent* and that she suffered from what is termed a "repetition compulsion." Dr. Plazak stated that this condition makes a person compelled to repeat; and, that it occurs in response to certain stressful circumstances which are similar to or exactly like those to which the person in the past has been repeatedly exposed. In the instant case, the evidence is that defendant's mother had killed her father when defendant was a small child, and as defendant grew up it appears she had been disciplined many times by being told that she too would some day kill someone under the same circumstances.

Defendant urges that there is no connection or similarity between her two felonious assaults and, therefore, Bernal's testimony was inadmissible under the general rule prohibiting the use of such evidence. E.g., *Kostal v. People,* 144 Colo. 505, 357 P.2d 70 (1960). She also claims this cannot come under any of the long recognized exceptions to the rule. See, e.g., *Warford v. People,* 43 Colo. 107, 96 Pac. 556 (1908); *Dockerty v. People* 74 Colo. 113, 219 Pac. 220 (1923); *Webb v. People,* 97 Colo. 262, 49 P.2d 381 (1935); *Rice v. People,* 55 Colo. 506, 136 Pac. 74 (1913); *Kostal, supra;* and Melville, *Manual of Criminal Evidence,* page 9 (2d Ed. 1954).

We do not agree with defendant. The People had the right to attempt to rebut her alleged lack of capacity to form a specific intent. *Castro v. People,* 140 Colo. 493,

346 P.2d 1020 (1959). And, Bernal's testimony was not rendered improper because it happened to include evidence of another offense. *Perry v. People,* 38 Colo. 23, 29, 87 Pac. 796 (1906). In addition, to warrant reversal, it would have to appear that the rebuttal testimony was prejudicial to defendant. Clearly such is not the case here for Bernal's testimony tended to substantiate the hypothesis of the psychiatrist that defendant suffered from repetition compulsion.

■ The third issue is whether Joseph Wolney, Jr.'s testimony of prior conversations with the deceased was admissible.

The record shows that the defendant called Wolney, who was identified as one of Dyson's best friends, as her own witness for a limited purpose after he had first testified on another matter for the People. On this direct examination he testified as to liquor being purchased and drunk by Dyson and others on the morning of the 20th when he was present. He stated that Dyson was not intoxicated; however, he didn't remember exact details. He himself was drinking beer at this stag event which took place away from defendant's home. No questions were asked on direct examination about quarrels with defendant or what had happened the night before. On cross examination, nevertheless, over the objections of defendant, the court permitted the People to question Wolney and elicit answers concerning conversations between Wolney and Dyson on the morning of the 20th such as that Dyson was then "going home to put her [defendant] out"; that "He had a quarrel the night before"; and, that "The conversation was, he had an argument the night before, and that he had to slap Dorothy to take a gun that she was loading away from her, and that he was going home and put her out."

The testimony about quarreling, of course, merely substantiated defendant's own testimony about the events of the previous evening. Defendant, nevertheless, ob-

jected to that evidence coming from Wolney as well as his statement about a gun as hearsay.

Was such testimony properly admitted? Since it was not a witness testifying as to what he had heard either the decedent or defendant tell the other we need not determine its admissibility on that basis. Nor, need we determine whether it was close enough in time so as to be part of the res gestae, as urged by the People. Here the court admitted the evidence solely to show the "mental state of the victim and ill feeling or hostility between decedent and defendant." Its use was also later expressly so limited by the court's Instruction No. 18; and, the determination as to its admissibility was largely within the discretion of the trial court. To have rejected the testimony for the purpose it was offered here would have been an abuse of discretion and would have resulted in error. See, e.g., *Bershenyi v. People,* 71 Colo. 432, 434, 207 Pac. 591 (1922). The applicable instruction here properly restricted the use of the evidence to its limited purpose. Thus, no error can be predicated on Wolney's answers.

The fourth ground of alleged error concerns defendant's attempt to impeach Wolney on re-direct examination after he had testified to the matters discussed under the third ground for reversal.

At the time of this request, counsel and the court left the court room and in chambers the trial court gave defendant's attorneys full opportunity to demonstrate why the witness was hostile. They, however, were not able to show that they were surprised by Wolney's testimony for they had known prior to calling him that he might testify as he did. Their objection was principally that he had told them or others this version along with other different versions of defendant's remarks. Wolney, of course, was defendant's witness. None of his answers on direct examination were hostile. The objection is to the cross-examination and to the court's halting the re-direct examination when it started as the cross-examination of

defendant's own witness. The People correctly point out on this writ of error that counsel's alleged "surprise" was not as to the facts elicited, but rather that the court permitted the witness to testify to alleged known statements of decedent. We find no abuse of discretion when the trial court refused permission to impeach him.

 Lastly, was there error in submitting to the jury instructions on both first and second degrees of murder? Also, was it error as urged in this connection, to deny defendant's Motion For Directed Verdict Of Acquittal; and, further, should a judgment Non Obstante have been entered because allegedly the verdict was contrary to the weight of the evidence and was assertedly the result of prejudice or passion, as assertedly is demonstrated by a review of the evidence as contained in the record?

Here the true essence of the case is what did or would a jury believe as to defendant's true motive or intent in firing the second and fatal shot at Dyson as he was going away from her and down the stairs? If it believed she still feared for her life and that Dyson was seeking the bayonet or some other weapon to continue the fray, and that she had no way to retreat, the jury might well have found her plea of self-defense justified; if, on the other hand, it believed she was not justified in firing the second shot because Dyson was in fact fleeing, it might have found her guilty of first degree murder. And, in between these two extremes were the second degree and manslaughter charges which the court properly instructed on.

From this record we must conclude that it was not only proper, but also necessary for the trial court to have instructed on all the degrees of murder and manslaughter as well as on self-defense, and no error occurred in this regard.

The judgment is affirmed.

Mr. Justice Day and Mr. Justice Frantz dissent.

MR. JUSTICE FRANTZ dissenting:

Certain testimony elicited from the witness Wolney by the People was damning, and being, in my view, inadmissible, requires a reversal. A chronology involving this witness is necessary in order to understand that error in respect of this witness had several facets.

The prosecution had called Wolney for the sole purpose of having him identify the deceased. In his testimony, Wolney told of his acquaintanceship with the deceased and identified the latter by certain photographs which were admitted in evidence. Wolney further testified that he had seen the deceased's body at the mortuary.

In the course of cross-examination, the defendant asked Wolney certain questions concerning activities of the deceased and Wolney on the day prior to the death. An objection to these questions on the ground that they were beyond the scope of the direct examination was sustained. The trial court suggested that, if defendant wanted this evidence introduced, she should later call Wolney as her witness.

Pursuant to the suggestion, the defendant did call Wolney as her witness in making her defense, and questioned him concerning the amount of drinking and the places frequented by him and the deceased the morning of the tragedy. Defense counsel admonished the witness at the time of interrogation, "Please don't refer to anything [deceased] stated." On cross-examination the prosecution, over defendant's objection, sought to go beyond the scope of defendant's direct examination of Wolney. Notwithstanding the objection, the court permitted questions and answers relating to quarrels between the defendant and the deceased on the night before, and questions and answers as to the substance of conversations between Wolney and the deceased on the morning of the tragedy, part of which shows that the deceased said he was then "going home to put [the defendant] out"; that

"the conversation was, he had an argument the night before, and that he had to slap [defendant] to take a gun that she was loading away from her, and that he was going home and put her out." The court admitted this testimony on the theory that it showed the "mental state of the victim and ill feeling or hostility between decedent and defendant."

On redirect examination, the defense attempted to mitigate the damage of this testimony by asking Wolney about other inconsistent statements he had made on the same matter. The trial court sustained the prosecution's objection on the theory that Wolney was a defense witness and he could not be impeached without the showing of surprise.

It will be noted from what has been said that the trial court applied the rule, limiting cross-examination to that which had been gone into on direct examination, to the defendant's effort to cross-examine Wolney when he testified for the People, and that the court did not apply the same principle when Wolney was called as a defense witness. It is submitted that this rule should operate alike for the People and for the defendant. What is sauce for the goose is sauce for the gander.

Ordinarily, cross-examination of a witness must be confined to the scope of the examination in chief, and any other evidence elicited thereby is and should be treated as new matter. Such new matter is subject to cross-examination, since it constitutes evidence produced by the original cross-examiner. *Carter v. People*, 119 Colo. 342, 204 P.2d 147; *Smith v. People*, 120 Colo. 39, 206 P.2d 826.

A case which involved an analogous situation to the present one is that of *State v. Board*, 135 Mont. 139, 337 P.2d 924. There the Court pithily said: "You may not parry with sharpened blade in cross and expect only a sheathed blade in return." Here, in relation to cross-examination, the court permitted the People to use the sharpened blade; conversely, it disarmed the defendant.

The right to cross-examination is unquestionably a valuable right, and to unwarrantably limit its use results in prejudicial error. "Where one cross-examines a witness called by his adversary as to matters beyond the direct examination and thus makes the witness his own, the party who called the witness has the right to cross-examine him as to such new matter." 58 Am. Jur. 342, § 618, Witnesses.

Again, using 58 Am. Jur., Witnesses, we quote from § 611, page 340, as follows: "In a judicial investigation the right of cross-examination is absolute, and not a mere privilege . . ." The text writer cites in support of this statement *Alford v. United States*, 282 U.S. 687, 51 S. Ct. 218, 75 L. Ed. 624; *Fahey v. Clark*, 125 Conn. 44, 3 A.2d 313, 120 A.L.R. 517; and *State v. Zolantakis*, 70 Utah 296, 259 Pac. 1044, 54 A.L.R. 1463.

The late Mr. Justice Hall declared in *Archina v People*, 135 Colo. 8, 307 P.2d 1083, that "the right of cross-examination is a valuable constitutional right guaranteed to all defendants." A constitutional right of cross-examination can hardly be less than an absolute right.

A case having a situational bearing on the present case is that of *United States v. Stoehr*, 196 F.2d 276, 33 A.L.R.2d 836. Note the language of the Court regarding the development of new matter: "Where new evidence is opened up on redirect examination, the opposing party *must* be given the right of cross-examination on the new matter . . ." (Emphasis supplied.) Here a reading of the cold, stark record as it reveals the testimony of Wolney in chambers discloses a difficult, resistive, and inconsistent witness who admitted he had been drinking prior to testifying. This was never presented to the jury. His prejudice and credibility were never, therefore, subjected to fundamental safeguards of accuracy and truthfulness by cross-examination. 58 Am. Jur. 339, § 610.

Did the trial court properly admit the testimony of Wolney in which he stated that the deceased had informed him that morning that deceased and the de-

fendant "had an argument the night before, and that he had to slap Dorothy to take a gun that she was loading away from her, and that he was going home and put her out"? Was such testimony properly admitted to show the "mental state of the victim and ill feeling or hostility between decedent and defendant?" These questions are answered in the negative.

I would hold that this is an improper application of the exception to the hearsay rule, known as utterances to show the mental state of a person; it was clearly hearsay insofar as it showed "ill feeling or hostility between decedent and defendant." On the question of state of mind, the trial court inverted the rule.

We are not concerned with the mental state of the deceased; his mental state was not a fact in issue in this case. At least, it was not an issue until and unless the defendant made it such. *Bershenyi v. People,* 71 Colo. 432, 207 Pac. 591. The majority thus misinterprets the *Bershenyi* case.

For the reasons herein stated, I am in disagreement with the majority opinion.

MR. JUSTICE DAY joins in this dissent.