## No. 21096.

WILBUR E. JONES, BONNIE JONES, ELEANOR C. BUCKLES, ALSO KNOWN AS ELEANOR C. BUCKLES MEDILL, AND TOM MCDONALD BY HIS FATHER AND NEXT FRIEND PAUL L. MCDONALD AND PAUL L. MCDONALD, INDIVIDUALLY *v.* GEORGE BLEGEN.

(420 P.2d 404)

Decided November 28, 1966

150

Laurance A. Ardell, for plaintiffs in error.

H. Myers Bumgardner, Charles D. Pierce, for defendant in error.

*In Department.*

Opinion by Mr. Justice Moore.

Plaintiffs in error will be referred to as the plaintiffs or where less than all of them are included the reference will be by name. Defendant in error will be mentioned by name or as the defendant.

The action arises out of an automobile accident that occurred on December 21, 1962, at about 11:30 P.M. on a bridge located approximately two or three miles west of Pueblo on the highway between that city and Canon City, Colorado. Two persons who were passengers in the motor vehicle operated by Larry Powers were killed in the accident: Lynne Buckles, age sixteen died at the scene, and Bertha Mae Jones, age seventeen, died the following day. The plaintiffs Wilbur E. Jones and Bonnie Jones were the natural parents of Bertha, and in the first statement of claim of the complaint have brought an action under the wrongful death statute against the defendant George Blegen, the driver of the other vehicle involved. The plaintiff Eleanor C. Medill was the only surviving parent of Lynne Buckles, and in the second statement of claim has brought an action under the wrongful death statute. The other passenger in

Powers' vehicle, Tom McDonald, sets forth his claim for personal injuries in the third statement of claim of the complaint.

On the evening of December 21, 1962, Larry Powers, Tom McDonald, Bertha Mae Jones and Lynne Buckles left Pueblo for Canon City about 7:00 P.M. The four teenagers went to Canon City and had dinner. At about 11:00 P.M. on the same date they started their return trip to Pueblo, and at the time of the accident Lynne Buckles was asleep in the front seat next to Larry Powers and Bertha Mae Jones had dozed in the back seat next to Tom McDonald. No one in the Powers' vehicle had been drinking and a blood alcohol specimen taken from Powers reflected no trace of alcohol.

The defendant George Blegen who lives in Canon City came to Pueblo at about 6:30 P.M. to attend a Christmas party sponsored by his employer, Houston Construction Co., at the Top of the Town. His arrival there was approximately two and one-half hours prior to the time that a dinner, accompanied by alcoholic drinks, was served. He admittedly consumed three drinks before dinner, and "a few drinks" were consumed by him during the course of the meal. After leaving the Christmas party he drove to the Columbine Inn Bar in Pueblo and he testified that while there he purchased a beer and drank about half of it, however a witness called by the defendant testified that he saw defendant seated at a table in the Columbine Inn Bar and that there appeared to be two mixed drinks on the table at which the defendant was seated.

Verlyn D. Peterson, a laboratory technologist at the City County Health Center, testified that he withdrew a specimen of blood from Mr. Blegen at 2:15 A.M. on December 22, 1962, and thereafter analyzed it and it measured .19. Dr. Robert Marsh, a pathologist, testified that in his opinion a person having a concentration of blood of .19 was intoxicated.

The approach to the bridge, where the cars collided,

from the west going east is downgrade on a hill, and this road is straight. The approach to the bridge from the east going west is level and there is a curve which commences 361 feet east of the east end of the bridge. The road at the scene of the accident was an asphalt surface road. It was 24 feet wide and was a two-lane highway. The witness Larry Powers testified that he was proceeding east and there was no traffic ahead of him proceeding in the same direction, nor was there any traffic behind him. He stated he was going fifty to sixty miles per hour. His account of the accident was as follows:

"A. As I was coming down the hill, the on-proaching car came around the curve. Once it came around the curve and the lights were in front of me, they were on my side of the road. I hit my brakes as hard as I could and still keep my car under control and held to my side of the road. At the last instance when I knew we was going to hit, no matter what, I threw my wheel to the left and we hit. I — just as I threw it, we hit, and that's all I remember.

\* \* \*

"Q. And how far were your vehicles apart when you made this observation that the Blegen vehicle was on the wrong side of the road?

"A. I would estimate around 600 feet, but I am not sure.

\* \* \*

"Q. Yes, sir. When did you leave your side of the road?

"A. When I knew we were going to hit, when there was no other hope, I turned my wheel to the left.

"Q. And why did you do that, Larry, if you know?

"A. That was all I could do. There was no other place for me to go.

"Q. Why couldn't you go to the right?

"A. The bridge was there.

"Q. Why didn't you just go straight ahead?

"A. Well, I thought by turning I could keep it from being directly head-on, whereas if I had gone straight, the way the car was coming, it would have been a perfectly head-on collision."

The defendant testified that he was driving his car on the right-hand side of the road as he approached the bridge. He stated that the car driven by Powers "was coming directly towards me on my side of the road. I tried — I swerved to the right and applied my brakes." Highway patrolmen took measurements of the skid marks laid down by the two cars. The Powers car left 162 feet of skid marks west of the point of impact before crossing the center line of the highway. The rear wheels of his car then crossed the center line at a point 32 feet before the impact of the cars on the bridge. This distance of 32 feet showed tire marks indicating that Powers had turned his car to the left. The car of the defendant left 90 feet of skid marks, all of which were on his right-hand side of the road.

The case does not involve any issue of contributory negligence since the driver of the car traveling in an easterly direction is not a party to the action. Upon trial to a jury verdicts were returned in favor of the defendant, upon which judgments were entered. The case is here on writ of error seeking reversal of these judgments.

In his argument for reversal of the judgments counsel for plaintiffs asserts that:

"The Court erred in permitting lay witnesses to testify on the issue of intoxication without proper foundation and without the question being in proper form."

The record bearing upon this point shows that the defendant called four witnesses for the purpose of meeting the evidence offered by the plaintiffs, tending to prove that the defendant was intoxicated. All of these witnesses attended the party sponsored by the defendant's employer. Throughout the course of the dinner bottles of liquor were on the table and the guests served them-

selves as often as they pleased, and in such amounts as they saw fit to pour into the glass. The dinner party broke up at around 10:30 P.M.

The type of question which each of these four witnesses was permitted to answer, over the objection of the plaintiffs' attorney, is illustrated by the following which is quoted from the testimony of the witness Joe Carlino:

"Q. Now from your observation of him in the Columbine Inn and during the evening at the Top of the Town, do you have an opinion based on what you observed of him at the last time you saw him, as to whether or not he would have been intoxicated to the point where he would be an unsafe driver?

"MR. ARDELL: I would object to that question, Your Honor, on the grounds that the witness doesn't have proper background to answer it, and also it's improper in form.

"THE COURT: Objection is overruled.

"Q. Would you answer the question, sir?

"A. Let me hear that question again.

"Q. Based on what you saw of Mr. Blegen during the evening and particularly at the last time you saw him at the Columbine Inn, do you have an opinion as to whether or not he was intoxicated at the last time you saw him, so that he would be an unfit driver?

"A. I don't believe he was intoxicated enough that he couldn't drive satisfactorily when I saw him.

"MR. PIERCE: Thank you.

"A. I couldn't say — I mean I couldn't tell, because he was sitting down, actually."

The only evidence tending to show any basis upon which Carlino could form an opinion concerning the sobriety of the defendant was the following:

"Q. And what contact, if any, did you have with him at that time?

"A. I just — I just went up to him and said, 'Hi, George, are you going to do some dancing here?' He

said, 'No, I am a little tired.' And he was sitting at the table. I said, 'Are you feeling all right' and everything, and he said, 'Yes, I'm okay.' That's all."

The witness said that there were two "mixed drink" glasses on the table before the defendant.

Another witness, one Robert Reinert, a nondrinking employee of the Houston Construction Company who was present at the party hosted by the company, testified as follows:

"Q. Did you have any particular duties at this party?

"A. You might say I did have particular duties. As in previous years there have been times when some of the fellows have gotten pretty badly oiled up, you might say, so beings as far as I am one of the sober members there, and at Mr. Houston's suggestion, I took a trip around the table and shook hands with every man there, getting him on his feet to see what kind of shape he was in. That, if you would call it a duty, is what I did at the party.

"Q. Now as far as Mr. Blegen is concerned, did you perform that duty?

"A. I did.

\* \* \*

"Q. Now from your observation of Mr. Blegen at this time, can you state an opinion from your observation as to whether or not he was intoxicated, so that in your opinion he would not be a safe person to be driving an automobile?

"A. My opinion is that he was not inebriated enough not to —

"MR. ARDELL: I would like to have that same objection to this question as the other.

"THE COURT: The Court will overrule the objection.

"A. In my opinion he wasn't inebriated enough not to drive a car."

Questions were asked of two other witnesses as to whether he was under the influence of intoxicating liquor to such an extent that "he would not be a safe

person to be driving an automobile." The objections made by counsel for the plaintiffs to the testimony of each of these four witnesses were good.

■■ A lay witness who has had sufficient opportunity to observe the demeanor and conduct of another may express an opinion as to whether the latter was intoxicated. The rule on intoxication is the same as that applicable to mental condition. As quoted with approval by this court in *Leick v. People,* 136 Colo. 535, 322 P.2d 674, we are committed to the rule that:

"* * * one who, in the opinion of the trial court, shows adequate means of becoming acquainted with the person whose mental condition is in issue, *after detailing the facts and circumstances concerning his acquaintance and the acts and conversation upon which his conclusion is based,* may give his opinion on the question of sanity. The weight of that opinion is for the jury."

*Turley v. People,* 73 Colo. 518, 216 Pac. 536; *Smith v. People,* 120 Colo. 39, 206 P.2d 826. Whether the ability of a person to drive an automobile has been impaired by the consumption of intoxicating liquor is a subject upon which a lay witness cannot express an opinion.

The testimony of those who made the alcohol test of blood taken from the defendant was that a normal person whose blood showed a concentration of .19 of alcohol would be intoxicated. Dr. Marsh testified, *inter alia,* as follows:

"A. Of course, normally the amount of alcohol in the blood is practically zero, and alcohol acts on the body by depressing the brain, depressing the, what we call, the cerebrum or the portion of the brain that controls judgment and the activity of the muscles and things, and that sort of thing. Normally a person with .05 or 50 milligram percent of alcohol in their blood will show some blurring of speech and will have a little trouble, oh, lighting a cigarette and something like that. When it gets up to about .1, these people will have a little trouble walking. This is the normal, average individual.

When they get a little above .1, .15, they will have trouble thinking, their judgment will be poor and they will usually be belligerent. When it gets much over that they become increasingly belligerent, uncoordinated, and when it gets up to about .3 they will become stuporous. When it gets up to about .6 they will die of alcoholic intoxication. So I think anyone at the level of .19 would be considerably clouded, mentally, and would not be able to exercise judgment. They would not be able to normally control their muscles and their limbs, and their reactions would be quite slow."

In the instant case the blood sample was drawn about three hours after the accident and the evidence was that the concentration of alcohol in the bloodstream would be less at that time than it was at the time of the accident.

The question as to whether the defendant by the use of alcohol had reduced his ability to think; whether his judgment was made poor; whether he had normal control of his muscles and limbs; and whether his reactions were slowed down by the alcohol in his blood, were of the utmost importance in determining whether the witness Powers gave a truthful account of the accident and the cause thereof. The evidence offered by the four witnesses who expressed their "opinions" as to whether the defendant was an "unfit" driver, fell far short of being competent for the consideration of the jury. This evidence was stressed in argument by counsel for the defendant. It might well have been a controlling consideration in the minds of the jurors and was clearly prejudicial to the rights of the plaintiffs.

The judgment is reversed and the cause remanded for a new trial.

Mr. Chief Justice Sutton and Mr. Justice McWilliams concur.